## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| George E. Norcross, III, Gregory B. Braca, and Philip A. Norcross,                    Plaintiffs, <br><br> v. <br><br> Republic First Bancorp, Inc., Harry Madonna, Andrew B. Cohen, Lisa Jacobs, Harris Wildstein, Peter B. Bartholow, and Benjamin C. Duster, IV, <br><br>                    Defendants. | Civil Action No. 2:22-cv-04953 |

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

**Page**

I.    Introduction ............................................................................................................... 1

II.    Background ................................................................................................................. 4

    A.    FRBK and its Board .......................................................................................... 4

    B.    The Norcross Group Targets the Board ............................................................ 5

    C.    Board Deadlock and the Appointment of a Custodian ...................................... 6

    D.    The Board Appoints Benjamin Duster ............................................................. 8

    E.    Several Directors Resign .................................................................................. 8

    F.    The Norcross Group's Attempted Director Nominations ................................... 9

         1.    Plaintiffs' Prior Preparation for Nomination ............................................... 9

         2.    The 2022 Annual Meeting .......................................................................... 10

         3.    The Board Sets the Annual Meeting Date .................................................... 10

         4.    Philip Norcross Submits Notice Materials ................................................... 11

         5.    The Board Rejects Mr. Norcross's Deficient Nomination .............................. 11

    G.    The Board Reduces the Number of Board Seats ............................................... 12

    H.    The Norcross Proposal to Take Control of the Company ................................... 13

III.    Legal Standard ........................................................................................................... 14

IV.    Argument ................................................................................................................... 15

    A.    Plaintiffs Do Not Show an "Indisputably Clear" Right to Relief or "Substantial" Likelihood of Success on the Merits ........................................... 15

         1.    Philip Norcross is not a record holder; the Notice Materials therefore did not comply with FRBK's advance notice provision and are invalid. ........................................................................................... 16

         2.    Plaintiffs' complaints about the reasonableness of the 10-day nomination deadline—which is industry standard—are belied by the fact that Plaintiffs met that deadline. .................................................. 28

         3.    The Board acted properly when it reduced the number of director seats. Plaintiffs' innuendo and supposition do not support any alleged nefarious purpose. ........................................................................ 30

         4.    The Board validly appointed Mr. Duster. .................................................. 33

    B.    Plaintiffs Fail to Demonstrate an Injunction is Necessary to Prevent Immediate and Irreparable Harm .................................................................... 34

         1.    Plaintiffs' Problem was Self-Inflicted ...................................................... 35

         2.       Plaintiffs Could Not Solicit Proxies For Braca Anyway ......................... 35

         3.       Plaintiffs Met the Nomination Deadline .................................... 36

         4.       Reduction of the Board Size Does Not Impose Immediate Harm ............ 37

         5.       Plaintiffs Allege No Harm From Mr. Duster's Appointment .................. 38

         6.       Less Intrusive Remedies Can Be Formulated ............................. 39

     C.     The Balance of the Equities and the Public Interest Weigh Against a
           Preliminary Injunction ........................................................ 39

V.     Conclusion ................................................................................. 42

## **TABLE OF AUTHORITIES**

**Cases**

*AB Value Partners, LP v. Kreisler Mfg. Corp.*,
   C.A. No. 10434, 2014 WL 7150465 (Del. Ch. Dec. 16, 2014) ......................................... 16, 20

*Accipiter Life Sciences Fund, L.P. v. Helfer*,
   905 A.2d 115 (Del. Ch. 2006) ......................................................................................... 29, 30

*Adams v. Jankourskas*,
   452 A.2d 148 (Del. 1982) ...................................................................................................... 39

*Anchel v. Shea*,
   762 A.2d 346 (Pa. Super. Ct. 2000) .................................................................................. 16, 40

*Bay Capital Fin., L.L.C. v. Barnes & Noble Educ., Inc.*,
   CV 2019-0539, 2020 WL 1527784 (Del. Ch. Mar. 30, 2020),
   *aff'd*, 249 A.3d 800 (Del. 2021) ................................................................................ 22, 28, 40

*Bechtold v. Coleman Realty Co.*,
   79 A.2d 661 (Pa. 1951) .......................................................................................................... 24

*Bennington Foods LLC v. St. Croix Renaissance, Grp., LLP*,
   528 F.3d 176 (3d Cir. 2008) .................................................................................................. 34

*Black & Decker Corp. v. Am. Standard Inc.*,
   679 F. Supp. 1183 (D. Del. 1988) .......................................................................................... 38

*BlackRock Credit Allocation Income Tr. v. Saba Cap. Master Fund, Ltd.*,
   224 A.3d 964 (Del. 2020) ...................................................................................................... 18

*Carey v. Pennsylvania Enterprises, Inc.*,
   876 F.2d 333 (3d Cir. 1989) .................................................................................................. 22

*Communist Party of Ind. v. Whitcomb*,
   409 U.S. 1235 (1972)............................................................................................................. 15

*Dolgoff v. Projectavision, Inc.*,
   No. C.A. 14805, 1996 WL 91945 (Del. Ch. Feb. 29, 1996).................................................. 39

*Driver Opportunity Partners I, LP v. Republic First Bancorp, Inc.*,
   No. 2:22-cv-1694-PD (E.D. Pa. May 13, 2022) .................................................................... 16

*ECRI v. McGraw-Hill, Inc.*,
   809 F.2d 223 (3d Cir. 1987) ............................................................................................. 34, 35

*Elliott v. Lindquist*,
   52 A.2d 180 (Pa. 1947) .......................................................................................................... 24

*Enstar Corp. v. Senouf*,
   535 A.2d 1351 (Del. 1987) .................................................................................................... 19

*High River Ltd. P'ship v. Mylan Labs., Inc.*,
   383 F. Supp. 2d 660 (M.D. Pa. 2005) .............................................................................. 18, 29

*High River Ltd. P'ship v. Mylan Labs., Inc.,*
No. 05-cv-0381, 2005 WL 3946400 (M.D. Pa. Feb. 24, 2005)............................................. 37

*Hill v. Cohen,*
40 F.4th 101 (3d Cir. 2022) ("*Hill II*") ........................................................................... passim

*Hill v. Cohen,*
No. 22-cv-1924-PD (E.D. Pa. May 17, 2022) ("*Hill I*")............................................... 6, 7

*Hope v. Warden York Cnty. Prison,*
972 F.3d 310 (3d Cir. 2020) ....................................................................................... 14, 16

*Hubbard v. Hollywood Park Realty Enterprises,*
No. 11779, 1991 WL 3151 (Del. Ch. Jan. 14, 1991)...................................................... 21

*In re Dole Food Co., Inc.,*
No. 8703-VCL, 2017 WL 624843 (Del. Ch. Feb. 15, 2017).......................................... 17

*In re Est. of Hall,*
731 A.2d 617 (Pa. Super. 1999).................................................................................... 18

*Jewelcor Mgmt., Inc. v. Thistle Grp. Holdings, Co.,*
60 Pa. D. & C.4th 391, 2002 WL 576457 (Pa. Com. Pl. 2002)..................................... 21

*Jorgl v. AIM ImmunoTech Inc.,*
No. 2022-0669, 2022 WL 16543834 (Del. Ch. Oct. 28, 2022) .................................. 16, 22, 36

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.,*
710 F.3d 99 (3d Cir. 2013) .......................................................................................... 14

*Katz v. Katz,*
No. 1014 WDA 2013, 2014 WL 10575352 (Pa. Super. Ct. Sept. 3, 2014)............................. 25

*Lerman v. Diagnostic Data, Inc.,*
421 A.2d 906 (Del. Ch. 1980) ..................................................................................... 21

*Linton v. Everett,*
No. 15219, 1997 WL 441189 (Del. Ch. July 31, 1997)........................................................ 30

*Liss v. Liss,*
No. 2063, 2003 WL 1848561 (Pa. Com. Pl. Jan. 29, 2003) ....................................... 25

*M4 Holdings, LLC v. Lake Harmony Ests. Prop. Owners' Ass'n,*
237 A.3d 1208 (Pa. Cmwlth. Ct. 2020) ...................................................................... 28

*McCray v. Lawrence St. Assocs., LLC,*
No. 2634, 2013 WL 9900610 (Pa. Com. Pl. June 4, 2013) ....................................... 25

*Munaf v. Geren,*
553 U.S. 674 (2008)..................................................................................................... 14

*Norcross v. Republic First Bancorp, Inc., et al.,*
No. 220300955 (Phil. Cty. Ct Common Pleas)............................................................. 5

*Norcross v. Republic First Bancorp, Inc., et al.,*
No. 2203019510 (Phil. Cty. Ct Common Pleas)........................................................... 5

iv

*Oliver Press Partners, LLC v. Decker*,
No. 1817-N, 2005 WL 3441364 (Del. Ch. Dec. 6, 2005)....................................... 39

*Openwave Sys. Inc. v. Harbinger Cap. Partners Master Fund I, Ltd.*,
924 A.2d 228 (Del. Ch. 2007) ............................................................................ passim

*Pell v. Kill*,
135 A.3d 764 (Del. Ch. 2016) ...................................................................................... 32

*Phelps Dodge Corp. v. Cyprus Amax Mins. Co.*,
No. C.A. 17383, 1999 WL 1054255 (Del. Ch. Sept. 27, 1999)................................ 17

*Punnett v. Carter*,
621 F.2d 578 (3d Cir. 1980) ........................................................................................ 14

*Purcell v. Milton Hershey Sch. Alumni Ass'n*,
884 A.2d 372 (Pa. Cmwlth. 2005) ............................................................................ 28

*Rosenbaum v. CytoDyn Inc.*,
C.A. No. 2021-0728, 2021 WL 4775140 (Del. Ch. Oct. 13, 2021) ("*Rosenbaum I*") ...... passim

*Rosenbaum v. CytoDyn Inc.*,
No. CV 2021-0728, 2021 WL 4890876 (Del. Ch. Oct. 20, 2021) ("*Rosenbaum II*") ........ 17, 35

*Salt Dome Oil Corp. v. Schenck*,
41 A.2d 583 (Del. 1945) .............................................................................................. 17

*Schnell v. Chris-Craft Industries, Inc.*,
285 A.2d 437 (Del. Ch. 1971) .................................................................................... 22

*Sellaro v. Glenn*,
No. 87-4872, 1988 WL 96803 (E.D. Pa. Sept. 14, 1988)....................................... 40

*Stewart v. Monongahela Val. Country Club*,
112 A.2d 444 (Pa. Super. 1955)................................................................................. 24

*Strategic Inv. Opportunities LLC v. Lee Enterprises, Inc.*,
No. CV 2021-1089, 2022 WL 453607 (Del. Ch. Feb. 14, 2022) .................... passim

*Stroud v. Grace*,
606 A.2d 75 (Del. 1992) .............................................................................................. 22

*Thayer v. Tax Claim Bureau of Bucks Cty..*,
701 A.2d 808 (Pa. Cmwlth. Ct. 1997) ....................................................................... 23

*TravelCenters of Am. LLC v. Brog*,
No. C.A. 3751, 2008 WL 5272861 (Del. Ch. Dec. 5, 2008) .................................... 17

*Trinity Indus., Inc. v. Chicago Bridge & Iron Co.*,
735 F.3d 131 (3d Cir. 2013) ........................................................................................ 14

*United States v. Cmwlth. of Pa.*,
533 F.2d 107 (3d Cir. 1976) ........................................................................................ 38

*United States v. Spectro Foods Corp.*,
544 F.2d 1175 (3d Cir. 1976) ...................................................................................... 15

*Unitrin, Inc. v. Am. Gen. Corp.*,
   651 A.2d 1361 (Del. 1995) ...................................................................................... 22

*Warehime v. Warehime*,
   777 A.2d 469 (Pa. Super. 2001) ("*Warehime I*")................................................... 38

*Warehime v. Warehime*,
   860 A.2d 41 (Pa. 2004) ("*Warehime II*")............................................................... 38

*Williams v. Sterling Oil of Okla., Inc.*,
   267 A.2d 630 (Del. Ch. 1970), *rev'd on other grounds*, 273 A.2d 264 (Del. 1971) ................ 17

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)...................................................................................................... 14

*Wolko v. Highway Truck Drivers & Helpers Loc.*, 107,
   232 F. Supp. 594 (E.D. Pa. 1964) ........................................................................... 38

**Rules and Statutes**

7 Pa. Stat. § 112(e) ........................................................................................................ 36

8 Del. C. § 219(c)........................................................................................................... 18

12 U.S.C. § 1841(a)(1)................................................................................................... 38

15 U.S.C. § 78n(a) ................................................................................................. 27, 35

15 Pa. Cons. Stat. Ann. § 1504(c) ................................................................................. 18

15 Pa. Cons. Stat. Ann. § 1758 ..................................................................................... 18

15 Pa. Cons. Stat. Ann. § 1758(e) ................................................................................. 18

15 Pa. Cons. Stat. Ann. § 1763(a) ................................................................................. 20

15 Pa. Cons. Stat. Ann. § 1764(a) ................................................................................. 20

15 Pa. Cons. Stat. Ann. § 1767(a) ................................................................................. 25

15 Pa. Cons. Stat. Ann. § 1767(a)(3) .............................................................................. 6

15 Pa. Cons. Stat. Ann. § 1767(c) ................................................................................. 25

**Rules**

12 C.F.R. § 225.32(d)(1)(i)-(ii) ..................................................................................... 37

17 C.F.R. § 240.14a-6 .................................................................................................... 36

17 C.F.R. § 240.14a-8 ............................................................................................. passim

17 C.F.R. § 240.14a-8(i)(8) ..................................................................................... 26, 27

17 C.F.R. § 240.14a-9 ............................................................................................. 27, 35

17 C.F.R. § 240.14a-19 .................................................................................................. 27

Fed. R. Civ. P. 65.......................................................................................................... 14

**Other Authorities**

Shareholder Proposals, Release No. 34-56160,
    72 Fed. Reg. 43466 (July 27, 2007) ........................................................................ 27

Proposals by Security Holders, Release No. 34-12598,
    41 Fed. Reg. 29982 (July 20, 1976) ........................................................................ 27

Shareholder Proposals Relating to the Election of Directors, Release No. 34-56914,
    72 Fed. Reg. 70450-01, 2007 WL 4299567 (Dec. 11, 2007) .................................. 27

Exch. Act Release No. 34-62764,
    75 Fed. Reg. 56688 (Sept. 16, 2010 ) ...................................................................... 27

Marc Treviño, H. Rodgin Cohen, Melissa Sawyer, & Jun Hu (Sullivan & Cromwell),
    "*2019 Proxy Season Review: Part 1—Rule 14a-8 Shareholder Proposals*," Harvard
    Law School Forum on Corporate Governance (July 26, 2019) ................................ 20

Speech by Keith F. Higgins, Director, Division of Corporation Finance, SEC "*Rule 14a-
8: Conflicting Proposals, Conflicting Views*," (February 10, 2015) ........................ 27

Defendants Republic First Bancorp, Inc. ("FRBK" or the "Company"), Harry Madonna, Andrew B. Cohen, Lisa Jacobs, Harris Wildstein, Peter B. Bartholow, and Benjamin C. Duster, IV (the "Board" and with FRBK, the "Defendants") respectfully submit this Memorandum of Law in support of their Opposition to the Motion for Preliminary Injunction filed by Plaintiffs George E. Norcross, III, Gregory B. Braca, and Philip A. Norcross ("Plaintiffs" or the "Norcross Group").

## I.   Introduction

Stripped of its hyperbole and feigned outrage over some supposed deprivation of shareholder rights, Plaintiffs' Complaint boils down to one thing—a complaint that FRBK rejected the effort by Plaintiff Philip Norcross to nominate Plaintiff Gregory Braca as a director candidate at the Company's long-delayed 2022 annual meeting set for January 26, 2023.  Rejection of Mr. Norcross's notice was entirely proper and actually advances shareholder rights and democracy.

Under a requirement that has been part of FRBK's Articles of Incorporation (the "Charter") and Amended and Restated By-Laws (the "By-Laws") for at least 17 years, a shareholder wishing to nominate a director candidate must be a *record owner* of Company shares.  Mr. Norcross was not.  And while he can assert a belief that he was a record owner or that his broker told him as much, subjective belief does not matter.  The test is whether Mr. Norcross was in fact a record owner.  The Company's stock ledger maintained by the Company's transfer agent, American Stock Transfer & Trust Company ("AST"), answers this question.  Certified copies of the record holder list provided by AST and submitted with this Opposition are clear:

- Neither Mr. Norcross nor any other member of the Norcross Group was a record holder of FRBK on November 11, 2022, when Mr. Norcross submitted his nomination.

- Nor were they record owners the next business day, November 14, 2022, which was the deadline for shareholder nominations of director candidates.

- Nor were their names on record-owner lists provided by the Company in response to Plaintiffs' demands in June and October 2022 for inspection of the record holder lists.

- And indeed, they were not record owners when they filed their injunction motion.

Mr. Norcross knew the requirement; his nomination of Mr. Braca recited (albeit inaccurately) that he was a record holder.  So this prerequisite to nomination, common with many corporations, was in no way hidden from Plaintiffs.  What's more, it would have been quite simple for Mr. Norcross or one of his co-Plaintiffs to become a record stockholder: the routine process could have been completed by Mr. Norcross's broker in at most a few days.  This was a straightforward, even-handed application of long-standing requirements for any shareholder to nominate a director candidate, and Mr. Norcross's nomination was fairly and properly rejected.

For this reason alone, Plaintiffs are unlikely to prevail on the merits, and their preliminary injunction motion should be denied.  Nor do their other merits arguments hold water.

- Their complaint that the director-nomination window was only open for 10 days is a red herring.  First, they met the deadline.  Second, the 10-day window is industry standard.  Third, any claim that the nomination deadline frustrated Plaintiffs' purported reliance on Rule 14a-8 is belied by the plain language of the federal regulation.

- The Board's judgment to reduce the number of directors from eight to six was based on a sound business basis having nothing to do with Board entrenchment, or a desire to interfere with the shareholder franchise or other rights.  Nor did the action have any impact on Plaintiffs' ability to put forward two director candidates.  First, Plaintiffs never purported to propose a second director candidate.  And their assertion that the smaller Board meant that they could only nominate one candidate instead of two because of issues related to "control" is inaccurate.  Federal banking regulations presume "control" for those with ownership of 5% or more of voting securities and director representatives that "*comprise 25 percent or more* of the board of directors."  Whether the Board has six or eight people on it, two Norcross-sponsored directors would have constituted at least 25%.

- The complaint that Ben Duster's appointment to the Board was improper because he was not a stockholder when appointed fails.  Under the By-Law provision governing appointments to fill a Board vacancy, which Plaintiffs never mention, stock ownership simply is not required.

More generally, in contrast with the innuendo and suppositions behind Plaintiffs' various allegations, every FRBK director defendant has submitted a declaration confirming that there was no "scheme" to entrench current directors, to disenfranchise shareholders or to curb shareholder

rights in any way, and that their actions and decisions were not based on any such motivation.  To the contrary, numerous recent Board actions point in precisely the opposite direction.

Even if some of Plaintiffs' disparate arguments raised serious questions, Plaintiffs' motion suffers from multiple other infirmities, particularly when measured against the heavy burden Plaintiffs face to secure the preliminary injunction they seek.  Far from being an injunction to preserve the status quo, Plaintiffs ask the Court—as literally the first action in the case after filing their Complaint—to enter an order that is the antithesis of a status-quo order:  a substantive, highly intrusive, mandatory injunction to dramatically alter the Company's governance structure.

Nor is there any emergent reason to do so.  Even with the Annual Meeting set for late January, Plaintiffs cannot demonstrate urgency here.

- While they could have done so at any time, Plaintiffs to date have not filed a preliminary proxy statement with the Securities and Exchange Commission ("SEC"), a prerequisite to soliciting proxies.  The SEC Staff must review and clear a proxy statement before it is deemed definitive—a process that takes between 10 and 21 days even assuming the Staff has no comments and does not mandate revisions.  Accordingly, Plaintiffs could not yet solicit proxies for Mr. Braca even if the nomination had been accepted, and will not be able to do so until at least early to mid-January.

- While they could have done so at any time, Plaintiffs did not seek approval from the Pennsylvania Department of Banking and Securities to solicit proxies for Mr. Braca until November 15, 2022.  Again assuming no objections or inquiry by the Commissioner, the Commissioner has 60 days to act on the application, meaning that again Plaintiffs could not solicit proxies for Mr. Braca's election until at least mid-January.

- Feigning emergency does not modify the weighty standard that Plaintiffs face.  Between the lack of urgency they exhibited, the 10 weeks between the nomination rejection and the Annual Meeting, and the mandatory, disruptive nature of the order they seek, Plaintiffs knew they could never meet the standard for a temporary restraining order.  Their TRO application dressed up in preliminary-injunction clothing should fare no better.

- And ultimately, if there is any urgency here, it results entirely from Plaintiffs' own actions.  It is simple for a beneficial owner of stock to become a record owner; Plaintiffs failed to take this step.  They failed, also, to file the necessary applications with the Department of Banking and the SEC on a time frame consistent with, or that might have mitigated, the emergency they now claim is upon the parties and the Court.

Finally, their motion fails because Plaintiffs cannot demonstrate irreparable harm, even assuming their table-pounding assertions about a grand scheme to abridge the shareholder franchise or other rights had some basis.  If it turns out that Plaintiffs can prove their allegations (which they cannot), FRBK is confident that the Court, in the exercise of its equitable powers, can fashion an appropriate remedy even after the Annual Meeting.  Ironically, though, recent events, including this litigation and a Norcross Group "offer" to invest new money in FRBK, make clear that Plaintiffs are the real enemy of shareholder democracy and shareholder rights, not the Board.

At bottom, there is no basis in law or in fact for the Court to direct the Board to just ignore a clear, long-standing, and common requirement that shareholders wishing to nominate director candidates be record owners of Company shares.  To allow, much less mandate that, a Board do so opens the door to the sort of arbitrary actions that genuinely threaten shareholder rights.  Surely Plaintiffs' showing, hefty though it may at first glance appear, comes nowhere close to meeting the high bar that the law properly imposes on persons seeking the extraordinary relief that Plaintiffs pray for here.  The Court should deny the preliminary injunction motion.

## II.   Background

### A.   FRBK and its Board

FRBK is a Pennsylvania corporation based in Philadelphia.  It is the bank holding company for Republic First Bank, which is FRBK's operational arm.  The Board of Directors of FRBK (the "Board") manages the Company's business and affairs, and has the authority to act on FRBK's behalf, consistent with the law, FRBK's Charter and By-Laws.  *See* Compl., Ex. 1 (By-Laws, Art. II, § 1) & Ex. 2 (Charter).  The individual Defendants are directors on FRBK's Board.[1]

---

[1] *See* Decl. of Harry Madonna ("Madonna Decl.") ¶ 2; Decl. of Harris Wildstein ("Wildstein Decl.") ¶ 2; Decl. of Benjamin C. Duster, IV ("Duster Decl.") ¶ 2; Decl. of Lisa Jacobs ("Jacobs Decl.") ¶ 2; Decl. of Andrew B. Cohen ("Cohen Decl.") ¶ 2; Decl. of Peter B. Bartholow ("Bartholow Decl.") ¶ 2.  Although each director has submitted a

### B.     The Norcross Group Targets the Board

Plaintiffs George E. Norcross, III, Gregory B. Braca, and Philip A. Norcross, along with non-party the Avery Conner Capital Trust (the "Norcross Group"), are activist investors who have been targeting the Company since late 2021.  They began by expressing interest in acquiring a controlling or substantial interest in the Company, and recommended that the Company replace then-Chief Executive Officer ("CEO") Vernon W. Hill, II, with Mr. Braca.  Madonna Decl. ¶ 3. The Norcross Group became increasingly critical of Mr. Hill, as well as of former directors Theodore J. Flocco, Jr., Brian P. Tierney, and Barry L. Spevak.  *Id.* ¶ 4.  In addition to leveling criticisms, the Norcross Group demanded that the Board form a special litigation committee to investigate aspects of the now-former directors' conduct, and served multiple books and records demands on the Company.  *Id.*

The Norcross Group previously filed two lawsuits against FRBK in March 2022.  The first was on March 8, when they sued the Company and Messrs. Hill, Spevak, Tierney, and Flocco, alleging, among other things, that the directors amended or intended to amend certain key executives' employment and compensation agreements in violation of shareholder voting rights and that such amendments were fundamentally unfair.  *See Norcross v. Republic First Bancorp, Inc., et al.*, No. 220300955 (Phil. Cty. Ct Common Pleas); Madonna Decl. ¶ 5.  The second came on March 29, when they sued the Company and complained about certain confidentiality conditions the Company requested before it would share certain books and records the Norcross Group demanded.  *See Norcross v. Republic First Bancorp, Inc., et al.*, No. 2203019510 (Phil. Cty. Ct Common Pleas); Madonna Decl. ¶ 6.  The Norcross Group later voluntarily dismissed both lawsuits after Mr. Madonna was appointed as Chairman of the Board.  *Id.* ¶ 8.

---

declaration in support of this Opposition, this Background section generally cites to a single director's declaration to avoid lengthy string cites.

On May 2, 2022, the Norcross Group filed a preliminary proxy statement with the SEC to oppose the election of Messrs. Hill, Flocco, and Spevak (who the Norcross Group anticipated would comprise the Company's director slate at its 2022 Annual Meeting). *Id.* ¶ 7. Yet during the Spring of 2022, the Norcross Group never nominated its own Board candidate despite the deluge of letters, demands, and lawsuits. *Id.* ¶ 9. By contrast, another stockholder group critical of the Company, Driver Opportunity Partners and its affiliates ("Driver"), actually put forward an alternative slate of directors (one of whom, Peter Bartholow, now sits on the Board). *Id.* Norcross announced an intent to solicit proxies against the Company's candidates and in support of Driver's. Compl., Ex. 6 (Norcross Group Form 13D/A).

### C.    Board Deadlock and the Appointment of a Custodian

From early 2022 until May, the Board consisted of eight directors, which split evenly into two groups with conflicting views about FRBK's future direction. Madonna Decl. ¶ 10. The groups were Messrs. Hill, Spevak, Tierney and Flocco on the one hand, and Messrs. Cohen, Madonna, and Wildstein and Ms. Jacobs, on the other. *Id.* The even split resulted in a deadlock with regard to certain issues of Company operations and strategy. *Id.*

Mr. Flocco passed away in May 2022. *Id.* ¶ 11. A majority of the remaining directors called a special Board meeting on May 13, 2022, which Messrs. Hill, Spevak, and Tierney declined to attend, asserting the meeting was improper. *Id.* At the meeting, the Board majority voted to remove Mr. Hill as Chairman and appoint Mr. Madonna as Chairman of the Board. *Id.* On May 16, 2022, the majority called two more special meetings with the intention to, among other things, appoint a new director to fill the vacancy left by Mr. Flocco. *Id.* ¶ 12.

In response, Messrs. Hill, Spevak, and Tierney filed litigation in the U.S. District Court for the Eastern District of Pennsylvania, challenging the Board's actions and seeking the appointment of a custodian pursuant to 15 Pa. C.S. § 1767(a)(3). *Id.* ¶ 13; *see also Hill v. Cohen*, No. 22-cv-

1924-PD (E.D. Pa. May 17, 2022) ("*Hill I*").  The dispute turned primarily on By-Law Article II, Section 7, which states in relevant part:

> Any vacancies in the Board of Directors, whether arising from death, resignation, removal or any other cause except an increase in the number of directors, shall be filled by a vote of the majority of the Board of Directors then in office even though that majority is less than a quorum.

*See* Compl., Ex. 1.  On May 26, the District Court held that the Board majority had acted without proper quorum and that its actions were likely ultra vires.  The Court also appointed a custodian, Alfred W. Putnam, to (1) oversee a special meeting of shareholders; and (2) take actions necessary to manage the Company.  *See Hill I*, Dkts. 15, 16.  When the custodian filed a motion to extend the deadline for holding a special shareholders' meeting, all directors (and Driver) agreed that the custodian should not convene a special meeting in light of the Company's anticipated annual meeting.  *See Hill I*, Dkts. 33, 39, 41, 44. The custodian objected, with the Norcross Group's support.  *See Hill I*, Dkts. 43, 45.  On June 24, the District Court agreed with the custodian and the Norcross Group, ordering the custodian to add an additional seat to the Board, and to fill that seat and Mr. Flocco's seat at a special meeting to be held by the end of July.  *See Hill I*, Dkt. 46.

On July 6, however, the U.S. Court of Appeals for the Third Circuit reversed, holding that the District Court, "while no doubt well-intentioned," had erroneously "supplant[ed] the Bylaws with its own process for filling the vacancy."  *See Hill v. Cohen*, 40 F.4th 101, 105 (3d Cir. 2022) ("*Hill II*").  The Third Circuit held that the custodian's appointment threatened harm to FRBK because it "foreclosed the method established by the Bylaws for filling the vacancy on the Board with an interim director," and the election of a ninth director "would undermine the independence of [FRBK] to make its own corporate governance decisions."  *Id.* at 111.  The court found By-Law Article II, Section 7 "unambiguous" and "clear;" the Board majority, then, had "the power and obligation to fill the vacancy" so "their efforts to do so were not illegal or oppressive."  *Id.* at 114,

116.  Overall, the court concluded, "there were no sound grounds for appointing a custodian for [FRBK]." *Id.* at 117.

### D.      The Board Appoints Benjamin Duster

With the Third Circuit's imprimatur, the Board on July 11 appointed Benjamin Duster to fill the vacancy, pursuant to Article II, Section 7, in lieu of the special shareholders' meeting that had previously been set by the custodian.  Compl., Ex. 11; Duster Decl. ¶ 2; Madonna Decl. ¶ 40. The Board felt that Mr. Duster was an excellent independent director candidate, with no prior affiliation with FRBK, and deep qualifications to serve as an independent director and Chair of the Board's Audit Committee.  Madonna Decl. ¶ 39.  When he was appointed, Mr. Duster was not an FRBK shareholder.  Duster Decl. ¶ 12.[2]  But Article II, Section 7 does not require, or even mention, stock ownership to appoint an "interim director," as the Third Circuit termed the role, *see Hill II*, 40 F.4th at 111—*i.e.*, people filling out the term of a director who had left the Board.  This contrasts with Article II, Section 2, which governs director candidates standing for election, and requires share ownership "at the commencement of his term."  Madonna Decl. ¶ 40.

### E.      Several Directors Resign

In August 2022, Mr. Hill resigned from his roles as FRBK's CEO and a director.  *Id.* ¶ 15. The Board appointed Mr. Madonna as Interim CEO and began a formal search for a new CEO. *Id*.  In August and September 2022, Messrs. Tierney and Spevak also resigned as directors.  *Id.*

---

[2]  Mr. Duster was unable to become a Company shareholder through open-market purchases of shares at the time of his appointment because of the short time frame involved and his immediate exposure to material non-public information concerning the Company's ongoing financial statement audit and its strategic review process.  Duster Decl. ¶ 12.  However, in connection with his nomination for election to the Board at the upcoming Annual Meeting, Mr. Duster acquired some shares in a private purchase from another director.  *Id.* ¶ 14.

### F.       The Norcross Group's Attempted Director Nominations

#### 1.       Plaintiffs' Prior Preparation for Nomination

Following Mr. Putnam's appointment, the Norcross Group submitted its first director nomination.  In early June 2022, Plaintiffs demanded inspection of certain Company books and records.  Compl., Ex. 10.  Per the District Court's order at the time, the demand was handled by the custodian, Mr. Putnam; the Board neither reviewed nor considered the request.  Jacobs Decl. ¶ 14.  In response to the demand, on July 5, the Company provided Mr. Norcross with a shareholder list showing the then-current record holders of FRBK stock, as well as with other documents. Decl. of Philip Norcross (Dkt. 5-8) ("Norcross Decl.") ¶ 11; Decl. of Michael L. Charlson ("Charlson Decl."), Exs. 1 & 3 (June 13 and July 5 shareholder lists).

Additionally, on June 21, 2022, Mr. Norcross announced his plan to nominate Gregory Braca to the Board at the special meeting that had been ordered by the District Court to take place in July.  Compl., Ex. 8.  This notice was accompanied by letter from Janney Montgomery Scott LLC asserting that Mr. Norcross was a record holder of Company stock.  *Id.*  The custodian "*preliminarily*" accepted the nomination; once again the Board was not involved in this consideration or preliminary acceptance.  Compl., Ex. 7 (Sch. 14C filed July 5, 2022); Jacobs Decl. ¶ 14; Cohen Decl. ¶ 14.  Whatever conclusion the custodian may have come to "preliminarily," neither Philip Norcross nor any other member of the Norcross Group was in fact a record holder of FRBK shares at the time.  Charlson Decl., Exs. 2 & 3 (June 21 and July 5 shareholder lists).

Regardless, Mr. Norcross's nomination was rendered a nullity on July 6, 2022, when the Third Circuit reversed the District Court's order imposing a custodian and special meeting on FRBK.  *Hill II*, 40 F.4th at 117.  After the Third Circuit ruled, Mr. Putnam's actions, including those related to a possible special meeting of stockholders, were invalid and of no effect.

9

### 2.    The 2022 Annual Meeting

The Board had internally selected April 26, 2022 as the original date for the 2022 annual meeting of shareholders (the "Annual Meeting"), as this was about one month after FRBK had anticipated filing its Annual Report on Form 10-K for the year ended December 31, 2021 (the "Annual Report") with the SEC.  Madonna Decl. ¶ 17.  But before FRBK had a chance to announce the date of the meeting or announce the Company's slate of directors, the Company's auditors, in connection with the audit of the Company's 2021 financial statements, advised that an independent investigation was needed to look into certain previously disclosed related-party transactions and related issues that were the subject of litigation from activist investors (including the Norcross Group lawsuit noted above).  *Id.* ¶ 21.  The Company was unable to file its Annual Report with the investigation under way; and, without an Annual Report, the Annual Meeting had to be delayed.  *Id.* ¶¶ 18-19.  Nonetheless, record shareholders could submit notices of director nominations at any time, including before the Annual Meeting date was set.  *Id.* ¶ 24.

As the delay in issuance of the Annual Report was the reason FRBK could not convene its Annual Meeting, the Board publicly announced its intent to set the Annual Meeting promptly after the Annual Report was filed.  *Id.* ¶ 20.  Despite these disclosures, the Norcross Group sent multiple letters to the Board complaining about the postponement and urging the Company to hold its Annual Meeting promptly.  *Id.* ¶ 21.  For example, in a June 10, 2022 letter, the Norcross Group stated that the "Company needs to hold a shareholder meeting as soon as possible."  *Id.*, Exs. 1-3.

### 3.    The Board Sets the Annual Meeting Date

FRBK filed its Annual Report with the SEC on October 26, 2022.  *Id.* ¶ 22.  Consistent with its statements to FRBK shareholders (and with the Norcross Group's demands), the Company set its Annual Meeting shortly after the filing.  It announced on November 4, 2022 that the continued Annual Meeting would take place on January 26, 2023.  *Id.* ¶ 23.

The Company also announced on November 4, 2022 that the new deadline for shareholder nominations of directors for the postponed Annual Meeting would be November 14, 2022.  *Id.* ¶ 24.  A 10-day nomination window is industry-standard when an Annual Meeting is delayed.  *See* Expert Report of Richard Grubaugh ("Grubaugh Report") ¶¶ 3, 31-32, 35.  The Norcross Group did not object to this deadline when it was announced.  Madonna Decl.  ¶ 25.

### 4.    Philip Norcross Submits Notice Materials

On October 25, Philip Norcross submitted a new demand for Company books and records, including "a complete record or list of the holders of record of the outstanding shares of the Company's common stock."  *Id.* ¶ 26.  In response, on November 11, 2022, FRBK sent Mr. Norcross a record-shareholder list as of November 2, 2022.  *Id.*; Decl. of Michael Verrechia ("Verrechia Decl."), Ex. A.

With these materials in hand—and having already prepared nomination materials earlier in the year—Mr. Norcross, on November 11, sent materials to the Board (the "Notice Materials") notifying it of his intention to nominate Mr. Braca for election.  Madonna Decl. ¶ 27.  The Notice Materials again included a letter from Janney Montgomery Scott LLC asserting that Mr. Norcross was a record owner of Company stock.  *Id.*  The Notice Materials were timely, submitted within the 10-day deadline.  As such, the Company moved forward with reviewing the materials for compliance with its Charter and By-Laws.

### 5.    The Board Rejects Mr. Norcross's Deficient Nomination

In reviewing the Notice Materials, the Company requested a current list of record shareholders as of the close of business on November 11, 2022 from its transfer agent, AST.  *Id.* ¶ 28.  Based on this list, FRBK learned that neither Mr. Norcross nor any member of the Norcross Group was, in fact, a record shareholder of the Company.  *Id.*  Surprised by Mr. Norcross' absence from the shareholder list, FRBK requested a second list as of the close of the next business day on

November 14, 2022 in case there was simply an error or delay in Philip Norcross' name being added to the list of record owners. *Id.*  November 14 was also the day that nominations were due, and FRBK would have accepted his record ownership as of this date. *Id.* ¶ 32  But again, neither Mr. Norcross nor any member of the Norcross Group appeared on the record shareholder list. *Id.*

As a result, the Board rejected the Notice Materials as deficient. *Id.* ¶ 31.  Article VII, Section D of the Charter requires written notice of a shareholder's intention to propose nominees to the Board. *Id.* ¶ 29.  This advance notice must include five items, including and most pertinent here, a "representation that the shareholder is a holder of record of stock entitled to vote at the meeting[.]" *Id.*  Article II, Section 4 of the By-Laws contains an identical provision. *Id.*  It was apparent based on the shareholder lists that Mr. Norcross's Notice Materials misrepresented his status as a record shareholder and were deficient. *Id.* ¶ 31.

On November 16, 2022, the Board wrote to Mr. Norcross rejecting his nomination of Mr. Braca. *Id.*  The sole reason was that Mr. Norcross was not a record owner, as the Charter and By-Laws require—a requirement that the Board understood and believed to be meaningful and that could not and should not be waived. *Id.* ¶¶ 34, 36.  But for Mr. Norcross not being a record owner, the Board was prepared, based on the information it then had, to accept Mr. Braca's nomination and proceed with a contested election at the Company's Annual Meeting. *Id.* ¶ 32.

G.    **The Board Reduces the Number of Board Seats**

Pursuant to its authority under Article II, Section 2 of the By-Laws, the Board on November 4, 2022, determined to reduce the number of directors from eight to six, consistent with the number of directors the Company had. *Id.* ¶¶ 41, 43.[3]  Beyond the fact that it is common for

---

[3] On December 22, 2022, the Company announced the appointment of Thomas X. Geisel as the Company's new President and CEO and as a Class I director of the Board. Madonna Decl. ¶ 32.  With Mr. Geisel's appointment,  the Board has increased the number of directors to seven. *Id.* ¶ 41; *see also* Charlson Decl., Ex. 13 (FRBK Form 8-K).

companies to modify the number of directors to reflect the number actually serving, the decision also reflected other concerns.  The Board noted the high legal costs incurred defending the Company and its directors after the early efforts to fill the vacancy left by Mr. Flocco's death, including the *Hill v. Cohen* case discussed above.  *Id.* ¶ 43.  The Board determined that, no matter who it selected to fill director vacancies, its appointment of a new director during this charged period in FRBK's history risked new litigation challenging the nomination, and the additional attendant expense and distraction.  *Id.*  In the Board's judgment, exposure to these risks was not in the best interest of the Company or its shareholders.  *Id.*

All six directors categorically deny Plaintiffs' allegation that the Board-size reduction was part of some scheme to entrench themselves or limit stockholder rights.  Instead, it filled Mr. Flocco's seat with Mr. Duster, a director without prior affiliations with FRBK or its people, and filled another vacancy with Mr. Bartholow, an independent director put forward by Driver (and previously supported by the Norcross Group).  *Id.* ¶¶ 39, 44; Jacobs Decl. ¶¶ 41, 43; Duster Decl. ¶¶ 16, 18; Cohen Decl. ¶¶ 44, 46; Wildstein Decl. ¶¶ 12, 14; Bartholow Decl. ¶¶ 11, 13.

## H.    The Norcross Proposal to Take Control of the Company

Since the Norcross Group first expressed its dissatisfaction with FRBK and policies, the Board has tried to work with the Norcross Group to resolve their differences.  Madonna Decl. ¶ 45.  The parties have exchanged proposals throughout 2022.  *Id.* ¶ 46.  Thus far, the effort has failed.

On December 9, 2022—three days after filing its preliminary injunction motion[4]—the Norcross Group made its latest offer (the "Norcross Proposal").  *Id.* ¶ 46 & Ex. 4.  The Norcross

---

[4] This is not the first time that the Norcross Group has attempted to use costly litigation as a pressure tactic in its negotiations.  As recounted by the Third Circuit, when the Norcross Group filed a March 2022 lawsuit against FRBK, it also "[a]lmost simultaneously . . . offered an investment of at least $50 million in exchange for a 51% stake in [FRBK], the right to nominate at least two members to the Board, and the resignation of Hill as chairman and CEO."  *Hill II*, 40 F.4th at 107.

Proposal seeks to make a significant capital infusion into FRBK in exchange for a preferred stock with a high guaranteed dividend of at least 7% and perhaps as high as 12%; no dividend could be paid to common stockholders until Plaintiffs received the guaranteed dividend they propose.  *Id.* ¶ 47.  The Norcross Group also demands three Board seats (of eight), or 37.5%—that is, effective control.  *Id.*  Yet the Norcross Proposal does not contemplate any payment to Company stockholders for ceding control.  And the Norcross Proposal calls for 16% of the new capital to be repaid to the Norcross Group, some $12 million, as a (generally unexplained) "expense reimbursement" for the Norcross Group's actions concerning FRBK over the past year.  *Id.* ¶ 48.

## III.   Legal Standard

A preliminary injunction is an "extraordinary and drastic remedy" that is "never awarded as of right."  *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008); Fed. R. Civ. P. 65.  Rather, a party seeking a preliminary injunction must demonstrate:  (1) "he is likely to succeed on the merits;" (2) "he is likely to suffer irreparable harm in the absence of preliminary relief;" (3) "the balance of equities tips in his favor;" and (4) "an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 21 (2008).  The first two factors are "threshold showings."  *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 105 (3d Cir. 2013).

Where, as here, a party seeks a mandatory (rather than prohibitory) injunction, a "heightened standard applies."  *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 320 (3d Cir. 2020); *see also Punnett v. Carter*, 621 F.2d 578, 582 (3d Cir. 1980) ("burden on the moving party is particularly heavy" when "the preliminary injunction is directed not merely at preserving the status quo but, as in this case, at providing mandatory relief").  Plaintiffs must "show a *substantial* likelihood of success on the merits and that their right to relief is *indisputably clear*."  *Hope*, 972 F.3d at 320 (emphasis added; citations omitted).  A mandatory injunction "is only granted sparingly by the courts."  *Trinity Indus., Inc. v. Chicago Bridge & Iron Co.*, 735 F.3d 131, 139 (3d

Cir. 2013) (citing *Communist Party of Ind. v. Whitcomb*, 409 U.S. 1235, 1235 (1972) (mandatory injunction is an "extraordinary remedy [to] be employed only in the most unusual case"); *United States v. Spectro Foods Corp.*, 544 F.2d 1175, 1181 (3d Cir. 1976) ("The power to issue a preliminary injunction, especially a mandatory one, should be sparingly exercised.")).

## IV.     Argument

Plaintiffs do not come close to meeting the onerous standard for entry of the mandatory preliminary injunction, particularly one that, as here, is for practical purposes case-dispositive. The advance notice provision, which has existed in the Company's Charter and By-Laws since at least 2005,[5] requires a shareholder to be a holder *of record* to be eligible to nominate a director candidate.  Plaintiffs indisputably were not record owners.  Instead, Plaintiffs insist that the Court should enter a broad-reaching affirmative injunction in essence waiving this common rule and modifying multiple corporate governance practices and determinations of the Company besides. In effect, Plaintiffs ask the Court to shift the blame for Plaintiffs' omission to put a few shares into record name onto FRBK, its entire Board of Directors and ultimately its rank-and-file stockholders. Although the Company's letter rejecting the Notice Materials was issued November 16, Plaintiffs did not present their mammoth preliminary injunction filing for three weeks.  Now, with a record consisting largely of assertion and innuendo, they demand that the Court, with no discovery, enter a case-dispositive order.  As to every requirement for a preliminary injunction, Plaintiffs fall short. The Court should deny the motion.

### A.     Plaintiffs Do Not Show an "Indisputably Clear" Right to Relief or "Substantial" Likelihood of Success on the Merits.

Plaintiffs ask the Court to order Defendants to (a) recognize Philip Norcross's nomination notice as valid and permit Mr. Braca to stand for election despite Mr. Norcross's failure to satisfy

---

[5] *See* Charlson Decl., Exs. 10 & 11 (2005 Charter and By-Laws).

the advance notice requirement; (b) reopen nominations for director candidates for the 2022 Annual Meeting; (c) change the size of the Board; (d) negate the recent appointment of Mr. Duster as a director to fill out Mr. Flocco's term; and (e) delay the 2022 Annual Meeting for at least 60 days. Plaintiffs' requests are "for mandatory injunctive relief," *not* relief that merely seeks to preserve the status quo. *Jorgl v. AIM ImmunoTech Inc.*, No. 2022-0669, 2022 WL 16543834, at *9 (Del. Ch. Oct. 28, 2022).[6] Yet Plaintiffs do not satisfy their heavy burden of showing a "substantial likelihood of success" or an "indisputably clear" right to relief. *Hope*, 972 F.3d at 320.[7] Their claims are legally flawed, and "myriad factual disputes" render "the imposition of mandatory relief impossible." *Jorgl*, 2022 WL 16543834, at *2.

### 1. Philip Norcross is not a record holder; the Notice Materials therefore did not comply with FRBK's advance notice provision and are invalid.

Identical provisions in FRBK's Charter and By-Laws require that a shareholder seeking to propose nominees to the Board must deliver advance notice of the intent to nominate and be a "holder of record of stock entitled to vote at the meeting." *See* Compl., Ex. 1 (By-Laws, Art. II, Section 4) & Ex. 2 (Charter, Art. VII, Section D). FRBK rejected the Notice Materials because, when he made his nomination, Philip Norcross was not a holder of record of FRBK shares. *See* Compl., Ex. 28. The Company checked twice to verify this before rejecting the nomination notice. *See* Madonna Decl. ¶ 28. The Company's record shareholder list, maintained and certified by the

---

[6] *See also* Order Denying TRO and Preliminary Injunction (Dkt. 23), *Driver Opportunity Partners I, LP v. Republic First Bancorp, Inc.*, No. 2:22-cv-1694-PD (E.D. Pa. May 13, 2022) (recognizing mandatory injunctive relief sought in motion requesting an order that would require FRBK to proceed with annual meeting by June 2022); *Rosenbaum v. CytoDyn Inc.*, C.A. No. 2021-0728, 2021 WL 4775140, at *12 (Del. Oct. 13, 2021) ("*Rosenbaum I*") (order forcing a board to include on ballot nominees from the rejected nomination notice amounted to mandatory injunctive relief); *AB Value Partners, LP v. Kreisler Mfg. Corp.*, C.A. No. 10434, 2014 WL 7150465, at *3 (Del. Ch. Dec. 16, 2014) (where plaintiff requested injunctive relief allowing it to run a dissident slate, it effectively sought a mandatory injunction requiring the board to waive the company's advance notice bylaw).

[7] *Cf. Anchel v. Shea*, 762 A.2d 346, 351-52 (Pa. Super. Ct. 2000) ("particularly in cases where parties are struggling for control of a corporation, 'complainant must establish that it is his clear legal right, not doubtful or uncertain, to the specific relief sought'").

transfer agent, AST, makes clear that neither Philip Norcross (nor any other Norcross Group member) was a record holder on November 11, 2022, the day he submitted the Notice Materials. *See* Charlson Decl., Ex. 5 (Nov. 11 shareholder list).  Nor was he a record holder when the nomination period closed.  *See id.*, Ex. 6 (Nov. 15 shareholder list).  And he *still* was not a record holder when he filed the Complaint or the motion for preliminary injunction.  *See id.*, Exs. 8-9 (Nov. 22 & Dec. 6 shareholder lists).  And Plaintiffs do not dispute that Philip Norcross was *not* a holder of record.  *See* Compl. ¶ 36 (alleging Norcross is a beneficial owner and "believed" he was a record holder based on broker's representations).[8]

Plaintiffs simply needed to comply with FRBK's advance notice provision. *TravelCenters of Am. LLC v. Brog*, No. C.A. 3751, 2008 WL 5272861, at *4 (Del. Ch. Dec. 5, 2008) ("submission of proper notice is simply a condition that must occur before [company] is obligated to allow a shareholder to nominate a person for election as a director").  They did not, and now rely on "a misplaced hope that equity would ride to the rescue should the Board call them out on the woefully deficient disclosure." *Rosenbaum I*, 2021 WL 4775140, at *18.  Plaintiffs have no basis to force FRBK to accept a deficient nomination notice.  *See Rosenbaum v. CytoDyn Inc.*, No. CV 2021-0728, 2021 WL 4890876, at *2, 4 (Del. Ch. Oct. 20, 2021) ("*Rosenbaum II*") (denying injunction for "self-inflicted" harm); *Phelps Dodge Corp. v. Cyprus Amax Mins. Co.*, No. C.A. 17383, 1999 WL 1054255, at *2 (Del. Ch. Sept. 27, 1999) ("Court cannot and ... should not save one from oneself.").

---

[8] A corporation has the right to rely on its corporate books as the sole evidence of record ownership.  *See Salt Dome Oil Corp. v. Schenck*, 41 A.2d 583, 589 (Del. 1945) ("[The corporation] may rightfully look to the corporate books as the sole evidence of membership." ); *Williams v. Sterling Oil of Okla., Inc*., 267 A.2d 630, 634 (Del. Ch. 1970) ("[I]n dealing with its stockholders a Delaware corporation need not look beyond the registered owners."), *rev'd on other grounds,* 273 A.2d 264 (Del. 1971); *In re Dole Food Co., Inc.,* No. 8703-VCL, 2017 WL 624843, at *5 (Del. Ch. Feb. 15, 2017) ("A series of Delaware Supreme Court decisions have made clear that a Delaware corporation only is required to recognize its record holders and need not attempt to determine its beneficial holders.").

a.        **FRBK properly rejected the Notice Materials.**

The Court should reject Plaintiffs' pleas to ignore their failure to comply with the advance notice provisions.  Under Pennsylvania law, "[s]hareholders are allowed to nominate candidates for election to the board, but the corporation is obligated to accept *only* those nominations submitted in accordance with advance notice requirements of the corporate bylaws, provided that those requirements are 'fair and reasonable' in light of corporate needs." *High River Ltd. P'ship v. Mylan Labs., Inc.*, 383 F. Supp. 2d 660, 663 (M.D. Pa. 2005) (emphasis added).[9]  Corporations may impose advance notice requirements on director-candidate nomination.  *See* 15 Pa. Cons. Stat. Ann. § 1758; *see also* Expert Report of Lawrence Hamermesh ("Hamermesh Report") ¶¶ 15-18.  Specifically, "[i]f the bylaws provide a fair and reasonable procedure for the nomination of candidates for election as directors, only candidates who have been duly nominated in accordance therewith shall be eligible for election."  *Id.* § 1758(e).  Any bylaw provisions authorized by Sections 1758(e) may, as they are here, also be set forth in the charter.  *Id.* § 1504(c).

Advance notice provisions are not only permitted, but are "frequently upheld as valid," and binding on shareholders.[10]  *See Openwave Sys. Inc. v. Harbinger Cap. Partners Master Fund I, Ltd.*, 924 A.2d 228, 239 (Del. Ch. 2007); *see also In re Est. of Hall*, 731 A.2d 617, 623 (Pa. Super. 1999) ("Corporate charters and by-laws are contracts among shareholders of a corporation").  Such advance notice provisions "serve an indisputably legitimate purpose."  *Rosenbaum I*, 2021 WL 4775140 at *14 (citing *BlackRock Credit Allocation Income Tr. v. Saba Cap. Master Fund, Ltd.*,

---

[9] The claims also fail as a matter of law to the extent they are brought against the individual directors.  As *High River* explained, "[n]otwithstanding the motivations of the individual board members, the advance notice bylaws represent an action of the *corporation*, not the directors.  Relief from enforcement of the bylaws, if available, must be sought from the corporation itself."  383 F. Supp. 2d at 665 (dismissing claims against individual directors).

[10] Courts construing Pennsylvania corporate law may look to Delaware cases on substantively similar statutes.  Like Pennsylvania, Delaware permits advance notice provisions and allows corporations to rely on record-holder status.  *See* 8 Del. C. § 219(c); *Hill II*, 40 F.4th at 115 (interpreting Pennsylvania law and noting "Delaware courts have provided helpful guidance").

224 A.3d 964, 980 (Del. 2020)). They are "commonplace tools for public companies to ensure orderly meetings and election contests," *Strategic Inv. Opportunities LLC v. Lee Enterprises, Inc.*, No. CV 2021-1089, 2022 WL 453607, at *9 (Del. Ch. Feb. 14, 2022), and to "prevent uncertainty in the electoral setting," *Saba*, 224 A.3d at 980. "To serve that end and provide corporations with sufficient time and information to respond, advance notice bylaws often have two primary aspects:" (1) to set a time period in which shareholders must give notice of their intent to nominate director candidates in advance of an annual meeting; and (2) "an informational requirement that serves an important disclosure function, allowing boards of directors to knowledgably make recommendations about nominees and ensuring that stockholders cast well-informed votes." *Lee*, 2022 WL 453607, at *9. And "courts generally enforce clear and unambiguous advance notice bylaws to avoid uncertainty in the electoral setting." *Id.*; *see also* Hamermesh Report ¶ 17.

The record holder requirement is easy for a stockholder to satisfy. The process involves a simple communication of instructions between a stockholder, its primary brokerage firm, and the Depository Trust Company – that is, the entity that holds formal title to the vast majority of securities held by investors in companies around the nation. *See* Grubaugh Report ¶ 13. Philip Norcross's purported belief that he was a record holder based on what his broker supposedly told him is beside the point. His interactions with his broker should be addressed with his broker; it has nothing to do with FRBK. "[FRBK] cannot, and should not, be blamed for the failure of a nominee or broker to correctly perfect [nomination] rights for a beneficial owner." *Enstar Corp. v. Senouf*, 535 A.2d 1351, 1355 (Del. 1987).

The transfer agent's records are clear and unambiguous: neither Mr. Norcross nor any other Norcross Group member was a record holder at the time of Mr. Norcross's attempted nomination of Mr. Braca. *See* Charlson Decl., Exs. 5-7 (November shareholder lists). That ends the inquiry.

19

Further, the record holder requirement is "neither facially problematic nor unreasonable as a matter of policy." *Lee*, 2022 WL 453607, at *16.  It "is not an empty formalism," but rather serves an important function:

> [C]orporations are entitled to rely upon record ownership, not beneficial ownership, in determining who is entitled to notice of and to vote at the meeting of stockholders.  The reason for that is simple: the corporation wants to confirm that an individual or entity making proposals has "skin in the game."  Reliance on record ownership ensures order and gives the corporation certainty that the party attempting to take action based on a right incidental to share ownership is, in fact, a stockholder . . . [T]he requirement gave the Company clarity on "who holds our stock" and was "by and far the cleanest way and the fairest way for all shareholders to know who actually owns the stock."

*Id.*; 15 Pa. Cons. Stat. Ann. §§ 1763(a), § 1764(a); *see also* Hamermesh Report ¶ 11 ("The reason corporations rely on record ownership is as simple as it is important: to ensure order and certainty in intra-corporate affairs, and to avoid corporate chaos.").  Indeed, even Plaintiffs' own corporate counsel has underscored the important distinction between record holders and beneficial owners, and the reasons for it, in published scholarly work directly on point.[11]  This likely explains why, of the 30 large publicly-traded companies that make up the Dow Jones Industrial Average index, 23 have similar record holder requirements.  *See* Hamermesh Report ¶ 21.

This is not a situation where a company adopted a new advance-notice provision or other requirement for nominations in the midst of a proxy contest.  Instead, FRBK adopted the advance notice provisions "on a clear day long before the present proxy challenge was contemplated by [the Norcross Group]."  *AB Value*, 2014 WL 7150465, at *3 (denying TRO and enforcing advance

---

[11] *See* Norcross Decl., Ex. B (listing H. Rodgin Cohen of Sullivan & Cromwell as counsel for Plaintiffs); Marc Treviño, H. Rodgin Cohen, Melissa Sawyer, & Jun Hu (Sullivan & Cromwell), "2019 Proxy Season Review: Part 1—Rule 14a-8 Shareholder Proposals," Harvard Law School Forum on Corporate Governance (July 26, 2019), *available at* https://corpgov.law.harvard.edu/2019/07/26/2019-proxy-season-review-part-1-rule-14a-8-shareholder-proposals/ ("Many companies require 'record' ownership of shares (as opposed to 'beneficial' ownership), essentially requiring street name holders to work through their securities intermediaries to become a record holder. This eliminates uncertainty as to proof of ownership, but introduces an additional administrative step for shareholders seeking to use the right.").

notice bylaw).  The requirement has been in place for at least 17 years.  *See* Charlson Decl., Exs. 10 & 11 (2005 Charter and By-Laws).  Mr. Norcross was undoubtedly aware of the requirement: the Notice Materials claimed he was a record holder, *see* Compl., Ex. 27, though this was untrue.[12]

Courts have routinely upheld advance notice provisions and record holder requirements in similar circumstances.  For instance, in *Strategic Inv. Opportunities LLC v. Lee Enterprises, Inc.*, the plaintiff sought a permanent injunction after the company rejected its nomination notice for failure to comply with the advance notice bylaw's record-holder requirement. 2022 WL 453607, at *8.  The court found that the nomination notice was deficient, and that equity did "not provide a basis for overriding the Board's rejection of the [n]otice" because the Board "acted reasonably." *Id.*  Rejecting the plaintiff's argument that the company should have waived the advance notice requirements or allowed the plaintiff an opportunity to cure any defects, the court noted that the bylaw requirements "could readily have been satisfied by any stockholder."  *Id.* at *16.  Nor was there "evidence of manipulative conduct":  as here, the bylaws were adopted on a "clear day," many years ago, and the record-holder requirement served a legitimate purpose.  *Id.*  The court further noted that there was nothing to suggest that the Board's "enforcement of the Bylaws was not made even handedly or in good faith."[13]  *Id.* at *17; *see also* Madonna Decl. ¶ 34.  Instead, just

---

[12] Contrary to Plaintiffs' strained reading, *Jewelcor Mgmt., Inc. v. Thistle Grp. Holdings, Co.*, 60 Pa. D. & C.4th 391, 2002 WL 576457 (Pa. Com. Pl. 2002), is not analogous.  *See* Pls. Memo (Dkt. 5-7) at 31.  In *Jewelcor*, the board advanced an annual meeting date to provide the incumbents with an advantage and so that an activist shareholder would not have "sufficient time to send, to receive and to process its proxy materials." *Id.* at *7-8.  The court ordered the meeting to be held on the original date to restore the status quo.  *Id.* at *8.  This case is quite different.  First, the FRBK Board simply enforced a long-standing record holder requirement.  Second, Plaintiffs' requested relief goes far beyond a status quo order, seeking instead affirmative, mandatory, and case-dispositive relief.  And unlike in *Jewelcor*, the Company's actions and litigation have been and are no bar to Plaintiffs soliciting proxies; instead, it is Plaintiffs who have failed to seek and obtain timely approval under federal and state law to proceed with proxy solicitation.  As a consequence, even if the Court ordered the Company to accept Mr. Braca's nomination today (which is entirely unwarranted), Plaintiffs would still be unable to solicit proxies solely due to their own delays.  *Infra* Section IV(B)(2).

[13] *Lee*'s analysis distinguishing three authorities—all of which Plaintiffs rely on here—applies with equal force to this case.  *See* 2022 WL 453607 at *17.  FRBK did not "significant[ly] change [the corporate] direction or policy" after the notice deadline had expired, as in *Hubbard v. Hollywood Park Realty Enterprises*, No. 11779, 1991 WL 3151, at *11-13 (Del. Ch. Jan. 14, 1991); set meeting dates that made it impossible for a shareholder to give timely notice of a nomination, as in *Lerman v. Diagnostic Data, Inc.*, 421 A.2d 906, 912-14 (Del. Ch. 1980); or amend the date of the

as here, the plaintiff's own actions are the reason he failed to satisfy the record holder requirements. Consistent with multiple prior courts determinations, the *Lee* court thus concluded that the Board's actions were "reasonable and appropriate." The Court should find the same here.

Similarly, in *Rosenbaum I*, the court denied a request for permanent injunction compelling the company to allow the plaintiffs' nominees to stand for election after it had rejected the nomination for failure to comply with an advance notice bylaw. 2021 WL 4775140, at *1. The company had received the nomination notice one day before the deadline, and sent a rejection letter a month later. *Id.* at *8, *10. The court rejected the plaintiffs' arguments that they had submitted a timely nomination notice and were prepared to engage with the company to address any perceived shortcomings, but the company let the nomination notice period end before sending a deficiency letter. *Id.* at *16. The court explained that the bylaw at issue—just as FRBK's advance notice provision—"provided no express process by which a stockholder could cure a deficient notice," and the plaintiffs—like Norcross—waited until the business day before the deadline to send their nomination notice "without any assurance in the unambiguous terms of the [bylaw] that the Board would be required to engage with them beyond the deadline." *Id.* at *16-*17. The plaintiffs' failure to submit a compliant notice, therefore, was not excused. So too here. This Court should likewise enforce FRBK's advance-notice provision.[14]

---

stockholder meeting to "obtain an inequitable advantage," as in *Schnell v. Chris-Craft Industries, Inc.*, 285 A.2d 437, 439 (Del. Ch. 1971). Plaintiffs do not and cannot offer a shred of evidence of any such actions. *See also infra* Part IV(A)(2) (discussing Plaintiffs' complaint about the purportedly short nomination window).

[14] *See also Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1388 n. 38 (Del. 1995) (advance notice bylaws upheld in hostile takeover situation); *Stroud v. Grace*, 606 A.2d 75, 95 (Del. 1992) (upholding advance bylaw provisions); *Carey v. Pennsylvania Enterprises, Inc.*, 876 F.2d 333, 334 (3d Cir. 1989) (enforcing bylaw that distinguished between "record" and "beneficial owners" for purposes of voting); *Bay Capital Fin., L.L.C. v. Barnes & Noble Educ., Inc.*, CV 2019-0539, 2020 WL 1527784 (Del. Ch. Mar. 30, 2020), *aff'd*, 249 A.3d 800 (Del. 2021) (enforcing advance-notice requirement that shareholder must be a record holder to nominate director candidates); *Saba*, 224 A.3d 964 (requiring compliance with advance notice bylaw provision, finding that "[permitting] election-contest participants to ignore a clear deadline then proffer after-the-fact reasons for their non-compliance with it" threatened the corporate electoral setting); *Openwave*, 924 A.2d 228 (enforcing advance notice provision in bylaws); *Jorgl*, 2022 WL 16543834 (denying injunction where it would allow purported nominee to circumvent advance notice bylaw provision).

**b.**      **FRBK did not "lull" Plaintiffs into believing it would treat Philip Norcross as a record holder.**

Having failed to comply with FRBK's record holder requirement, Plaintiffs now look for someone else to blame.  They claim that FRBK "lulled" them into believing they would be treated as record holders because the Company had "superior access" to the official shareholder lists, such that waiver and estoppel should apply.  Pls.' Memo. at 51.  This is false.  Plaintiffs had access to the Company's shareholder lists at least four months before Philip Norcross submitted the Notice Materials—because he made a demand for them and FRBK provided them.  Indeed, Plaintiffs concede that FRBK *twice* provided them with record shareholder lists—lists that show neither Philip Norcross nor any Norcross Group member as a record holder of FRBK shares.  *See* Norcross Decl. ¶¶ 11-12; Verrechia Decl., Ex. A; Charlson Decl., Exs. 1-5 (shareholder lists).

Plaintiffs' receipt of the shareholder lists alone bars any estoppel theory.  *See* Pls.' Memo. at 54 (stating estoppel requires a showing that Plaintiffs "lacked knowledge *or the means of obtaining knowledge of the truth* of the facts in question") (emphasis added); *Thayer v. Tax Claim Bureau of Bucks Cty.*, 701 A.2d 808, 810 (Pa. Cmwlth. Ct. 1997) ("requirement of 'equitable estoppel' is that the party claiming reliance must be unable to inform himself of the true facts").  Had Plaintiffs reviewed the records that they themselves demanded from FRBK multiple times, they would have known that Mr. Norcross was not a holder of record.  Indeed, their brief appears to concede that they reviewed the shareholder lists and had questions about them, but did nothing about the Norcross's not appearing on them.  *See* Pls. Memo. at 55 n.3.  Plaintiffs try to excuse their failure by asserting that they "did not follow up" because the July "special shareholder meeting scheduled by the custodian was cancelled."  *Id.*  But this ignores that they knew the 2022 annual meeting would eventually be held; they had repeatedly pressed the Company to hold that meeting "as soon as possible."  *See, e.g.*, Madonna Decl., Exs. 1-3.  Plaintiffs *had* access to the

23

Company's shareholder lists at multiple times during 2022 and continued to run a proxy campaign with the hopes of nominating a director candidate, but never looked at the lists they received to confirm their inclusion on them. *See* Grubaugh Report ¶ 24 ("If one of my clients requests and receives a record shareholder list…my practice is to review the list to determine if it is necessary to move shares into record ownership.").

Nor has there been any waiver of the record-holder requirement for a nomination notice. As the declarations make clear, the Company was surprised to realize that Philip Norcross was not a record holder at the time it received the Notice Materials. Madonna Decl. ¶ 28; Jacobs Decl. ¶ 30. There is *no* evidence that any director had actual knowledge that Mr. Norcross was not actually a record holder any earlier. Instead, the Company accepted Mr. Norcross's (and his broker's) repeated representations that he was a record holder. The record-holder requirement is one that has been enforced, including for another shareholder activist Driver (whose name *does* appear on the Company's record holder lists). *See Bechtold v. Coleman Realty Co.*, 79 A.2d 661 (Pa. 1951) (holding bylaw not waived by merely inconsistent observance and distinguishing *Elliott v. Lindquist*, 52 A.2d 180 (Pa. 1947), where bylaw "had *never* been observed") (original emphasis); *Stewart v. Monongahela Val. Country Club*, 112 A.2d 444 (Pa. Super. 1955) (no waiver of bylaw).

Additionally, when Mr. Norcross first demanded shareholders' list, when he sent his June nomination letter, a court-appointed custodian held the Board's powers. Madonna Decl. ¶ 13; Jacobs Decl. ¶ 14. The Board was uninvolved, and neither reviewed nor accepted Mr. Norcross's purported status as a record holder. *Id.* Nor did the custodian definitively accept that status either. Rather, he "concluded, *on a preliminary basis*, that the nominees have been nominated in accordance with the provisions of the Company's By-laws." Compl., Ex. 7 (Sch. 14C filed July 5,

2022) (emphasis added).  Whatever the basis for this "preliminary conclusion," the custodian could not have determined the nomination was valid had he checked Mr. Norcross's status (as opposed to accepting Mr. Norcross's representation) because the transfer agent's list as of close of business on July 5 did *not* include Mr. Norcross as a record holder.  Charlson Decl., Ex. 3.  Nor did the June 13 list—the date of Mr. Norcross's books-and-records demand.  *Id.*, Ex. 1.

Finally, even if the custodian had purported to accept the nomination, his actions are void because his appointment was *overturned* as invalid.  The Third Circuit held "there were no sound grounds for appointing a custodian for Republic First."   *Hill II*, 40 F.4th at 117.   Under Pennsylvania law, a custodian's authority exists only as the court specifies. *McCray v. Lawrence St. Assocs., LLC*, No. 2634, 2013 WL 9900610, at *2 (Pa. Com. Pl. June 4, 2013) ("[a]s an officer of the court, a receiver has only such powers and authorities as are given him by the court") (citation omitted).[15]  The power and effect of a custodian's actions "depend almost entirely on the purpose of his appointment and the extent of his powers conferred by the decree appointing him." *Katz v. Katz*, No. 1014 WDA 2013, 2014 WL 10575352, at *7 (Pa. Super. Ct. Sept. 3, 2014) (citation omitted).  Not only was the custodian never validly appointed, but his insistence that a special meeting be held went against the wishes of *all* members (not just one faction) of FRBK's Board.  *Hill II*, 40 F.4th at 109.

### c.        Rule 14a-8 provides no relief for Plaintiffs.

Plaintiffs also seek to circumvent the record-holder requirement and reopen the nomination period by arguing that, had the nomination deadline been two days later, Philip Norcross could have nominated director candidates as only a beneficial owner.  They point to SEC Rule 14a-8,

---

[15] Pennsylvania courts have used the term "custodian" and "receiver" interchangeably.  *Liss v. Liss*, No. 2063, 2003 WL 1848561 (Pa. Com. Pl. Jan. 29, 2003) (using both terms in applying 15 Pa. Cons. Stat. Ann. § 1767(a)); *see also* 15 Pa. Cons. Stat. Ann. § 1767(c)); *cf. Hill II*, 40 F.4th at 109-11 (considering the custodian to be a "receiver" for purposes of appellate jurisdiction).

which governs "when a company must include a shareholder's proposal in its proxy statement and identify the proposal in its form of proxy when the company holds an annual or special meeting of shareholders." 17 C.F.R. § 240.14a-8.  In general, Rule 14a-8 permits beneficial owners who have held shares at least a year to include proposals submitted by such beneficial owners in the issuer's proxy statement and secure a vote on them, under certain circumstances and within certain time frames.  Because Article II, Section 4 of FRBK's By-Laws references Rule 14a-8, Plaintiffs urge that the reference negates the record-owner requirement and means that "a beneficial shareholder (rather than a record owner) may nominate directors by complying with Rule 14a-8 under the Exchange Act." *See* Pls.' Memo. at 25.  Plaintiffs' position is wrong; it conflicts with the plain language of both Rule 14a-8 and the Company's advance-notice provision.

*First*, by its express terms, Rule 14a-8 *does not apply to shareholder nominations of director candidates*.  Although Plaintiffs attempt to pick and choose among portions of the Rule on which they want to rely, they cannot ignore an express exclusion in the Rule directly applicable to the circumstances here.  The Rule explicitly permits a company to *exclude* certain shareholder proposals related to director elections.  *See* 17 C.F.R. § 240.14a-8(i)(8).  Relevant here, an issuer may exclude a proposal if it: "(iv) Seeks to include *a specific individual in the company's proxy materials for election to the board of directors*; or (v) Otherwise could affect the outcome of the upcoming election of directors." *Id.*  Thus, the plain language of Rule 14a-8 simply does not support Plaintiffs' proffered interpretation; Rule 14a-8 cannot be relied on by shareholders, beneficial or otherwise, to nominate candidates for election to the boards of public companies with securities registered pursuant to Section 12 of the Securities Exchange Act.

Indeed, the SEC's long-standing stated rationale for Rule 14a-8—to augment state law with rules for conducting proxy campaigns and ensuring proper disclosure—is incompatible with

Plaintiffs' attempt to use the Rule to evade FRBK's record-holder requirement.  The SEC has made

clear that the proxy rules are not intended to supplant state law; Pennsylvania law permits advance

notice provisions with record-holder requirements. *Supra* Part IV(A)(1)(a); *see also* Shareholder

Proposals, SEC Release No. 34-56160, 72 Fed. Reg. 43466, 43467 (July 27, 2007) ("[T]he federal

proxy authority is not intended to supplant state law, but rather to reinforce state law rights with a

sturdy federal disclosure and proxy solicitation regime.").[16]  The Commission has emphasized that

Rule 14a-8 may *not* be used for conducting proxy contests for the election of directors.  In a 2007

Release, for example, the SEC explained that an interpretation of Rule 14a-8(i)(8) that results in

the Rule "being used as a means to include shareholder nominees in company proxy materials

would, in effect, circumvent the other proxy rules designed to assure the integrity of director

elections."[17]  *See* Shareholder Proposals Relating to the Election of Directors, SEC Release No.

34-56914, 72 Fed. Reg. 70450-01, 2007 WL 4299567 (Dec. 11, 2007); *see also, e.g.,* Proposals by

Security Holders, SEC Release No. 34-12598, 41 Fed. Reg. 29982 (July 20, 1976) ("Rule 14a-8 is

not the proper means for conducting" director election campaigns as other proxy rules regulate

that issue).   Even when the SEC narrowed the exclusions from Rule 14a-8, in 2010, the

Commission ensured that proposals targeted at specific candidates remained excludable and noted

it was "codify[ing] certain prior staff interpretations with respect to the types of proposals that

would continue to be excludable."  Exch. Act Release No. 34-62764, 75 Fed. Reg. 56688, 56782

(Sept. 16, 2010).  In short, Rule 14a-8 does nothing to alter FRBK's requirement that to nominate

---

[16] *See also* Speech by Keith F. Higgins, Director, Division of Corporation Finance, SEC "Rule 14a-8: Conflicting Proposals, Conflicting Views," (February 10, 2015) https://www.sec.gov/news/speech/rule-14a-8-conflicting-proposals-conflicting-views#_edn5 ("In particular, our federal proxy regulatory scheme, adopted under Section 14(a) of the Exchange Act, regulates the proxy process through which most shareholders in public companies exercise the voting rights granted to them under state law. It is designed not to supplant the rights granted under state law, but rather to help give them effect in a system in which shareholders rarely attend a meeting to vote in person.").

[17] For instance, as detailed *infra* Part IV(B), Plaintiffs can solicit proxies *only* after they have filed a definitive proxy statement that has been reviewed and cleared by the SEC.  See 15 U.S.C. § 78n(a); 17 C.F.R. § 240.14a-9; 17 C.F.R. § 240.14a-19.

a director candidate, a shareholder must be a record owner of shares.

*Second*, Plaintiffs' suggested reading of the Charter and By-Laws violates basic principles of interpretation by rendering the record-holder requirement a nullity. In Pennsylvania, courts interpret corporate bylaws using the same rules as for contract and statutory interpretation. *See M4 Holdings, LLC v. Lake Harmony Ests. Prop. Owners' Ass'n*, 237 A.3d 1208, 1218 (Pa. Cmwlth. Ct. 2020); *Purcell v. Milton Hershey Sch. Alumni Ass'n*, 884 A.2d 372, 379 n.10 (Pa. Cmwlth. 2005). Courts must construe a charter or bylaw "to give effect to all of its provisions so that none are rendered mere surplusage." *M4 Holdings*, 237 A.3d at 1219. FRBK's governing documents require written notice by a "holder of record of stock;" the Board "may refuse to recognize the nomination of any person not made in compliance" with that requirement. Compl., Ex. 1 (By-Laws, Art. II, Section 4) & Ex. 2 (Charter, Art. VII, Section D); Madonna Decl. ¶ 29; *see also Bay Capital*, 2020 WL 1527784, at *9 (enforcing an almost-identical advance notice bylaw providing that "[t]he chairman of the meeting may refuse to acknowledge the nomination of any person not made in compliance with the foregoing procedure."). Plaintiffs' assertion that they need only be a beneficial owner improperly reads the record-holder requirement out of the Charter and By-Laws. That interpretation must be rejected. Instead, the By-Law's reference to Rule 14a-8 can rationally be read only to concern the *timing* of receipt of a nomination notice. It does not alter the substantive requirements for *submitting* a nomination notice. Plaintiffs may not use Rule 14a-8 to avoid the consequences of their failure to comply with this clear requirement or to reopen the nomination period.

> **2.    Plaintiffs' complaints about the reasonableness of the 10-day nomination deadline—which is industry standard—are belied by the fact that Plaintiffs met that deadline.**

Plaintiffs' assertion that the Company's 10-day deadline for shareholder nominations was unreasonable is a red herring. First, Plaintiffs submitted the Notice Materials on November 11,

2022—that is, well within deadline that FRBK established—and, as detailed above, had no basis to rely on Rule 14a-8's one-year beneficial owner provision.  *See* Compl., Ex. 27.  The issue was not the *timeliness* of Mr. Norcross's Notice; it was that he tried to make his nomination when he was *not a record owner*, as the Charter and By-Law require.  Although his notice was deficient because Mr. Norcross was not a record holder, Plaintiffs' timely submission demonstrates that the Company's deadline for shareholder nominations was reasonable.  At a minimum, having satisfied the deadline and unable to rely on Rule 14a-8, Plaintiffs lack standing to complain.[18]

In any case, Plaintiffs' allegations regarding the "reasonableness" of the nomination period are unsupported.  Plaintiffs assert that it is "clear" that Defendants set the November 14 deadline for nominations "not for any valid reason but instead to foreclose Plaintiffs from satisfying the one-year holding standard under Rule 14a-8."  Pls.' Memo. at 46.  But as discussed above, Rule 14a-8 has no applicability to director nominations, so its one-year ownership provision is just beside the point.[19]  *Supra* Part IV(A)(1)(c).  And Plaintiffs offer no evidence of any malicious motive either.  Instead, where, as here, an annual meeting has been rescheduled or delayed for more than 30 days, it is customary to set a notice period of 10 days.  *See* Grubaugh Report ¶¶ 31-33.  FRBK's Annual Meeting had been planned for Spring 2022, but was postponed due to the delay in filing the Annual Report for 2021.  As such, FRBK followed industry practice and set a reasonable nomination period of 10 days in connection with the postponed meeting.

Courts have also upheld 10-day nomination periods.  *See, e.g., Accipiter Life Sciences*

---

[18] Having met the deadline themselves, Plaintiffs cannot bring a claim on behalf of other shareholders over the purportedly "short" nomination window.  *See High River Ltd. P'ship v. Mylan Labs., Inc.*, 383 F. Supp. 2d 660, 664–65 (M.D. Pa. 2005) (dismissing claims related to advance notice provisions "based on alleged harms to other shareholders" because "[t]here [was] no indication [the plaintiff's] interests are so inextricably bound to other shareholders as to allow it to assert a cause of action on their behalf.").

[19] Again, Rule 14a-8's one-year provision is inapplicable here.  But even if it were, as a practical matter, Plaintiffs had a simple remedy if they were concerned they would not meet the one-year requirement:  they could have become a record holder.  *See supra* Part IV(A)(1).

*Fund, L.P. v. Helfer*, 905 A.2d 115, 122, 127 (Del. Ch. 2006) (10-day advance notice provision valid because neither the announcement nor time period "make the dissident's challenge extremely difficult or impossible"); *Openwave*, 924 A.2d at 240 (10-day advance notice provision valid). Plaintiffs' reliance on *Linton v. Everett*, No. 15219, 1997 WL 441189 (Del. Ch. July 31, 1997), is inapposite. That case involved "highly unusual circumstances" and "extraordinary" facts, none of which are comparable to the situation here. *See Accipiter*, 905 A.2d at 125 (distinguishing *Linton*). In *Linton*, the board called an annual meeting after three years without having had one, triggering a bylaw that required shareholder nominations in 10 days. 1997 WL 441189, at *5, 9. Plaintiffs did not receive the meeting notice until three days before the deadline. The court determined that "in the unusual circumstances presented here, that notice period was not reasonable." *Id.* at *10. The plaintiffs would effectively have been required to be prepared to nominate on a "hair-trigger" after years of inactivity. *Id.* Even so, the court cautioned that its holding should *not* be read "to suggest that the advance notice provision was inequitable *per se*." *Id.* The facts here are very different. Plaintiffs knew well that an annual meeting would be scheduled once the Form 10-K was filed; indeed, they insisted repeatedly during the year that a meeting be called "as soon as possible." *See* Madonna Decl., Exs. 1-3. Moreover, Plaintiffs had submitted a notice (albeit a deficient one) purporting to nominate Mr. Braca in response to the custodian's call for a special shareholders' meeting (later invalidated) in July. And most significantly, Plaintiffs in fact submitted Mr. Braca's nomination within the notice period. As Mr. Norcross's notice was timely, Plaintiffs' complaints about FRBK's 10-day notice period are meritless.

> **3.    The Board acted properly when it reduced the number of director seats.  Plaintiffs' innuendo and supposition do not support any alleged nefarious purpose.**

On November 4, 2022, the Board decided to reduce the size of the Board from eight to six directors.  Under Article II, Section 2 of the By-Laws, the Board has the authority to fix the size

of the Board (between 5 and 25 directors), and there was nothing improper or inequitable about reducing the Board to a size that matched the number of directors actually serving. Plaintiffs offer no evidence of an entrenchment motivation, a significant omission as such allegations require more "than merely laying out the timeline of Defendants' conduct and speculating about bad intent or purpose." *Saba*, 224 A.3d at 981. Plaintiffs do not and cannot satisfy their burden.

Courts have rejected similar arguments to those advanced by Plaintiffs here. For instance, in *Openwave*, the plaintiff (an activist fund) alleged the company improperly reduced the board's size from seven to six seats in response to (1) plaintiff filing its initial Schedule 13G and (2) a presentation by counsel and Merrill Lynch on the company's "vulnerability" to plaintiff. 924 A.2d at 233, 242. It pointed "to the timing of the reduction to support its allegation that the reduction in board seats was done to undermine its ability to wage an effective proxy fight" and to nominate director candidates. *Id.* 242-43. Relying on the directors' testimony, however, the court concluded that "the reduction in the number of board seats was not a defensive measure designed to interfere with the stockholder franchise." *Id.* The board believed it was "good corporate governance to eliminate the vacant board seat," which otherwise might "send a signal to the market that the board is unable to find a qualified candidate," and "creates a situation where any candidate, nominated by any stockholder, can win a seat on the board simply by running unopposed." *Id.* Overall, the board was concerned with the corporate governance issues and acted in good faith. *Id.*

As in *Openwave*, the evidence shows that the FRBK Board's determination was made in good faith and grounded in corporate governance concerns. In contrast with Plaintiffs' innuendo and assertion, FRBK has presented sworn declarations from each director categorically denying that the Board-size reduction had anything to do with trying to entrench current directors. To the contrary, the reduction was meant to reflect the current number of directors, and protect the

Company from the distraction and expense of litigation that the Board anticipated could occur should it appoint people to fill vacant Board seats, pursuant to Article II, Section 7 of the Bylaws. The concern had a clear basis: when the Board attempted in May 2022 to fill the vacancy resulting from Mr. Flocco's death, a faction of the Board led by now-former CEO Vernon Hill sued and actually got a District Court order appointing a custodian, requiring an appeal to the Third Circuit to reverse that order erroneously entered. It was distracting and expensive for the Company. Mr. Hill has more recently brought additional litigation against the Company. And this lawsuit—and its challenge of Mr. Duster's appointment—is yet another example of the hostile environment the Board is attempting to navigate. Because it could serve to prevent further expense and distraction from litigation, the Board determined that reducing the size of the Board to its then-current level was in the best interest of the Company and its shareholders. *See* Madonna Decl. ¶¶ 43-44; Cohen Decl. ¶¶ 45-46; Jacobs Decl. ¶¶ 42-43; Wildstein Decl. ¶¶ 13-14; Bartholow Decl. ¶¶ 12-13; Duster Decl. ¶¶ 17-18. Nothing suggests that the reduction was an effort to squeeze Plaintiffs or any other shareholder or to limit their rights.[20]

Finally, any purported "entrenchment scheme" is further belied by the addition of Mr. Bartholow to the Board. Mr. Bartholow was a candidate put forward by another shareholder activist, Driver, and was supported last Spring by the Norcross Group. *See* Compl. ¶¶ 43, 67 & Ex. 6 (Sch. 13D/A announcing Plaintiffs' intent to file proxy materials and engage in solicitation

---

[20] Plaintiffs' heavy reliance on *Pell v. Kill*, 135 A.3d 764 (Del. Ch. 2016), is misplaced. Unlike in *Pell*, the reduction in FRBK's Board size has not "made it impossible" for shareholders to elect new directors or establish a new majority during the upcoming annual meeting. *Id.* at 788. As discussed *infra* Part IV(B), federal banking regulations limited the Norcross Group to nominating less than 25% of the Board—*i.e.*, one director candidate—regardless of whether the Board had six or eight seats. Philip Norcross's nomination was turned back simply because he failed to submit a valid nomination notice. *See supra* Part IV(A)(1). And the Norcross Group never proposed a second nominee anyway. Further, the *Pell* directors eliminated board seats to avoid a proxy contest "that could shift control at the Board level," as demonstrated by "contemporaneous communications [referring] explicitly to the need to maintain control and the concomitant benefit of avoiding a proxy contest." *Id.* at 792. By contrast, Plaintiffs have presented no such evidence here; nor could they. Rather, the individual defendants have put forward sworn declarations setting forth legitimate reasons for the reduction. Lastly, this claim is moot in light of Plaintiffs' failure to submit a valid nomination notice.

activities in support of Driver's slate of candidates, including Mr. Bartholow).

### 4.     The Board validly appointed Mr. Duster.

In addition to the attempt to force FRBK to recognize their nomination notice, Plaintiffs also seek to oust current interim director Ben Duster from Board.  The Board duly appointed Mr. Duster to the Board on July 7, 2022, to fill the vacancy created by the death of former director Mr. Flocco.  *See* Madonna Decl. ¶¶ 38-39.  In particular, Plaintiffs assert that the Board ignored a By-Law provision that purportedly required Mr. Duster to be a Company shareholder before he was eligible for appointment.  Based on this argument, Plaintiffs contend that the Board is willing to ignore By-Laws when it serves their purposes, but not when it comes to Philip Norcross's nomination.  The contentions are meritless.  The By-Law provision that Plaintiffs invoke was inapplicable to Mr. Duster's appointment to fill a Board vacancy.[21]  His appointment was and is entirely valid.

In fact, the By-Laws distinguish between directors being elected by shareholders to begin a new term and those filling a mid-term vacancy resulting from a director's departure. While it is true that Article II, Section 2 of the By-Laws requires that a director "must be a shareholder of the Corporation at the *commencement of his term*" (emphasis added), Mr. Duster was not elected to a new term and was not elected pursuant to Article II, Section 2.  Rather, he was *appointed* pursuant to Article II, Section 7, which governs vacancies.  It makes no mention of any stock-ownership requirement.  It states that "[a]ny director elected or appointed to fill a vacancy shall hold office

---

[21] Plaintiffs' theory might be more credible were Mr. Duster somehow beholden to the incumbent directors such that his appointment would further ensure their continuation in power.  But while Plaintiffs make such insinuation, they offer not a shred of evidence to support it.  In fact, the evidence contradicts any inference that Mr. Duster's appointment was intended to entrench current directors.  Mr. Duster lives across the country from Philadelphia and has had no prior affiliation with FRBK or any of its directors.  Duster Decl. ¶ 11; Madonna Decl. ¶ 39.  He was appointed not only as an interim director, to fill Mr. Flocco's term, but also as Chair of the Audit Committee, specifically because of his independence. Madonna Decl. ¶ 39.  Plaintiffs' innuendo concerning Mr. Duster illustrates well the Norcross Group's say-anything approach to a motion for substantial affirmative injunctive relief.  The Court should reject their effort.

*for the balance of the term then remaining*" (emphasis added).  The drafting clearly differentiates between "term then remaining" and "commencement of his term."  A director filling a vacancy is not "commencing" his own term but is instead serving out the balance of another's term already begun and is, therefore, not subject to the stock ownership requirement of Article II, Section 2.

This is the case with Mr. Duster.  Indeed, the Third Circuit affirmed that the Board "had the power and in fact the obligation to fill the vacancy left by Flocco."  *Hill II*, 40 F.4th at 114 (describing Art. II, Section 7 as "clear" and "unambiguous").  As a Class III director on the Company's staggered Board on which directors serve for three-year terms, Mr. Duster is up for election at the Company's upcoming 2022 Annual Meeting, scheduled for January 26, 2023—just over six months from his appointment.  At that time, Mr. Duster, in order to commence what will be a new (and his first) term as a director, is obliged by Article II, Section 2 to be an FRBK shareholder.  Despite the difficulties with making any open-market purchases of Company shares during his tenure—since his appointment, he has been in constant possession of material non-public information that has prevented him from trading in FRBK stock—Mr. Duster has acquired a small number of  shares and so satisfies this requirement.  Duster Decl. ¶ 14.

## B.     Plaintiffs Fail to Demonstrate an Injunction is Necessary to Prevent Immediate and Irreparable Harm.

Plaintiffs' preliminary injunction request should also be denied because Plaintiffs cannot show immediate, irreparable harm.  Again, Plaintiffs—seeking a mandatory injunction to be entered as a *de facto* case-dispositive order at the outset of the lawsuit they commenced—must meet a heightened standard and make "a clear showing of immediate irreparable injury."  *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987) (citation omitted); *see also Bennington Foods LLC v. St. Croix Renaissance, Grp., LLP*, 528 F.3d 176, 179 (3d Cir. 2008) ("[W]here the relief ordered by the preliminary injunction is mandatory and will alter the status quo, the party seeking

the injunction must meet a higher standard of showing irreparable harm in the absence of an injunction.").  The harm must be truly irreparable, not "merely serious or substantial."  *ECRI*, 809 F.2d at 226. Merely "[e]stablishing a risk of irreparable harm is not enough."  *Id.*

### 1.    Plaintiffs' Problem was Self-Inflicted

Any purported harm flowing from FRBK's rejection of Philip Norcross's nomination notice is harm of Plaintiffs' own making.  *Rosenbaum II*, 2021 WL 4890876, at *2 (denying injunctive relief where "any such harm is, in large measure, self-inflicted").  Mr. Norcross agreed to be bound by FRBK's Charter and Bylaws when he invested in the Company's stock.  He had months to become a holder of record.  And he had the shareholder lists at his fingertips to verify whether his name appeared on the transfer agent's stock ledgers—most recently on a record holder list dated November 2, 2022.  Verrechia Decl., Ex. A; Charlson Decl., Ex. 4.  He did not do so. His neglect does not excuse his failure to satisfy the advance notice provision.

### 2.    Plaintiffs Could Not Solicit Proxies For Braca Anyway

Nor is there any immediate risk of harm.  Plaintiffs say that with the Annual Meeting set for January 26, the Court must act now.  There is in fact no actual urgency:  even if FRBK had accepted Mr. Norcross's purported nomination of Mr. Braca (which it was unable to do), Plaintiffs would still, as of today, be unable to solicit proxies for Mr. Braca's election.

Under Section 14 of the Securities Exchange Act of 1934, as amended, Plaintiffs can solicit proxies *only* pursuant to a filed definitive proxy statement that has been reviewed and cleared by the SEC.  *See* 15 U.S.C. § 78n(a); 17 C.F.R. § 240.14a-9.  Plaintiffs could have filed a preliminary proxy statement, thereby commencing the SEC review process, when they submitted their nomination on November 11 or even beforehand, but they did not.  And they still have not.[22]  The

---

[22] That Defendants dispute the validity of the purported nomination notice does not prevent Plaintiffs from filing a preliminary proxy statement with the SEC.  *See, e.g.,* Preliminary Proxy Statement by shareholder activist of AIM

SEC then needs time to examine the proxy statement, and often makes multiple rounds of comments that require filing amendments to the proxy statement, particularly in a contested situation. *See* 17 C.F.R. § 240.14a-6. The process of clearing SEC comments on a contested proxy statement routinely takes between 10 days (in the rare instances where the SEC Staff has no significant comments) to three weeks or more. Again, as of this filing, Plaintiffs have done nothing to commence that process.[23]

Plaintiffs also are barred from soliciting proxies for Mr. Braca until an application to do so has been approved by the Pennsylvania Department of Banking and Securities. Although Plaintiffs again could have sought that approval at any time in 2022 after identifying Mr. Braca as their prospective director nominee (which they allege was early in the year, Compl., Ex. 7), they did not in fact even apply for that approval until November 15. While Plaintiffs claim that the application "will be granted shortly, pursuant to Section 503.E of the Department of Banking and Securities Code, there is a 30-day comment period following the filing of an application, and the Department cannot act on the application until after that period has expired. Then, the regulations give the Department at least another 30 days within which to act on an application. *See* 7 Pa. Stat. § 112(e). In other words, because Plaintiffs did not bother apply to the Commissioner until November 15, Plaintiffs might well not get leave to solicit proxies for Mr. Braca by the time of the Annual Meeting, regardless of any action by FRBK.

### 3.    Plaintiffs Met the Nomination Deadline

Nor do Plaintiffs' complaints about the purported short window within which stockholders

---

Immunotech Inc. (filed Sept. 15, 2022), available at https://www.sec.gov/Archives/edgar/data/946644/000119312522245230/0001193125-22-245230-index.htm (preliminary proxy filed before court ruled on validity of nomination notice); *Jorgl*, 2022 WL 16543834 (Del. Ch. Oct. 28, 2022) (parallel litigation).

[23] All SEC filings related to FRBK are publicly available online; as of the date of this filing, a preliminary proxy statement for Plaintiffs does not appear. *See* https://www.sec.gov/edgar/browse/?CIK=834285&owner=exclude.

could nominate director candidates hold water. Again, the fact is that they *met* the deadline: they timely submitted their nomination of Mr. Braca and were not entitled to rely on Rule 14a-8. The problem was that Mr. Norcross was not a record owner of FRBK shares when he made his nomination on November 11. *Supra* Part IV(A)(1). Plaintiffs never once objected to the deadline. Indeed, they never even objected to a shorter deadline of seven days set by a custodian of the Company earlier this year with respect to a federal district court-ordered special meeting of shareholder that the Third Circuit later overturned. *See* Charlson Decl., Ex. 12 (Form 8-K filed June 17, 2022). They have suffered no harm from the 10-day nomination period. *See High River Ltd. P'ship v. Mylan Labs., Inc.*, No. 05-cv-0381, 2005 WL 3946400, at *1 (M.D. Pa. Feb. 24, 2005) (denying injunction based on purportedly "unreasonable" nomination deadline for lack of irreparable harm because plaintiff "able to assemble slate of nominees and meet the deadline").

### 4.  Reduction of the Board Size Does Not Impose Immediate Harm

Further, there is no immediate irreparable harm from the reduction in the size of FRBK's Board. Plaintiffs say that because of the reduced  Board size, they are somehow prohibited from seeking two Board seats under some unspecified "federal banking regulations" related to "control." *See* Compl. at 7 n.2; Pls. Memo. at 21, 36. The argument is another red herring. This is an apparent reference to Regulation Y, 12 C.F.R. § 225.32 ("Reg Y"), (pertaining to Bank Holding Companies and Change in Bank Control). Under Reg Y, a party may not obtain Board representation greater than a certain threshold without regulatory approval.

Under Reg Y, however, Plaintiffs would be unable to have more than a single Board representative without triggering a regulatory-approval requirement, *regardless* of whether the Board had six seats or eight. *See* 12 C.F.R. § 225.32(d)(1)(i)-(ii) (setting a presumption of control for those with ownership of 5% or more of voting securities and director representatives that "***comprise 25 percent or more*** of the board of directors[.]") (emphasis added); 12 U.S.C.

§ 1841(a)(1).  Plaintiffs' contrary suggestion notwithstanding, two directors of an eight-person Board would trigger Reg Y just as it would were there six directors.  It is accordingly no surprise that Plaintiffs have never put forward, much less tried to nominate, more than one director candidate, including last July when the Board had eight seats.

Additionally, within days of filing this motion, Plaintiffs had made a proposal to the Company under which they demanded three seats (of eight under their proposal)—that is 37.5% of the seats.  *See* Madonna Decl., Ex. 4.  Apparently, Plaintiffs have no *real* issue with having to seek regulatory approval for an effort to gain effective control of the Company unless that mandate can be twisted (albeit without evidence) into a narrative about how Plaintiffs are supposedly being deprived of their rights as shareholders.  Their arguments fall flat.[24]

### 5.    Plaintiffs Allege No Harm From Mr. Duster's Appointment

Plaintiffs do not even attempt to allege harm arising from Mr. Duster's appointment, because they cannot.  Plaintiffs' claim for injunctive relief on this basis can, therefore, be easily rejected.  *See   United States v. Cmwlth. of Pa.*, 533 F.2d 107, 110 (3d Cir. 1976) ("essential prerequisite to the grant of a preliminary injunction is a showing by the movant of irreparable injury pendente lite if the relief is not granted"); *Wolko v. Highway Truck Drivers & Helpers Loc.*, 107, 232 F. Supp. 594, 597 (E.D. Pa. 1964) (irreparable harm is "sine qua non for the issuance of a preliminary injunction"); *Black & Decker Corp. v. Am. Standard Inc.*, 679 F. Supp. 1183, 1193 (D. Del. 1988) ("Once a movant fails to prove irreparable harm, the Court need not reach the

---

[24] Plaintiffs' reliance on *Warehime v. Warehime*, 777 A.2d 469 (Pa. Super. 2001) ("*Warehime I*"), is improper.  *E.g.,* Pls. Memo at 34.  That case was *reversed* by the Supreme Court of Pennsylvania, which affirmed the trial court's denial of a preliminary injunction because (1) the plaintiff failed to show immediate, irreparable harm, and (2) far greater harm would result from the granting of a preliminary injunction.  *Warehime v. Warehime*, 860 A.2d 41, 47 (Pa. 2004) ("*Warehime II*").  The case is further inapposite because, in stark contrast to the directors here, the *Warehime* directors "freely admitted" that they intended to "deter a change in control" by implementing a plan to issue additional stock such that entrenched directors would be in control of over 50% of the vote.  *Warehime I*, 777 A.2d at 474.  Here, the FRBK directors have submitted sworn declarations denying any such entrenchment motive.

question of probability of success on the merits") (collecting cases); *Dolgoff v. Projectavision, Inc.*, No. C.A. 14805, 1996 WL 91945, at *9 (Del. Ch. Feb. 29, 1996) (even if other factors favor preliminary injunction, such relief cannot issue absent sufficient allegation of harm).

### 6.    Less Intrusive Remedies Can Be Formulated

There is no irreparable harm because, if Plaintiffs were ultimately successful (which they will not be), adequate post-election remedies exist.  Indeed, the Court, in the exercise of its equitable powers, could order a range of remedies, after Plaintiffs' allegations are subject to discovery and tried on the merits (without the artificiality of the temporal emergency Plaintiffs attempt to suggest).  *See, e.g.*, *Oliver Press Partners, LLC v. Decker*, No. 1817-N, 2005 WL 3441364, at *1-2 (Del. Ch. Dec. 6, 2005) (denying expedited challenge to advance-notice provision for lack of irreparable harm; "if the plaintiffs succeed on the merits," "an adequate remedy could be fashioned after the fact," such as ordering classified directors to stand for election again the following year).

In sum, Plaintiffs' claim of irreparable harm in the absence of immediate, case-dispositive intervention by this Court is unsupported and unsubstantiated.

### C.    The Balance of the Equities and the Public Interest Weigh Against a Preliminary Injunction.

As an additional basis for denying the requested injunction, the balance of equities and public interest would not be served by granting the injunction for which Plaintiffs pray—again, an injunction that seeks to upend the status quo, on a supposed emergency basis and without discovery or normal record development, and drastically alter the long-established powers of the Board under the Company's organizational documents.

To begin, "equity aids the vigilant, not those who slumber on their rights."  *Adams v. Jankourskas*, 452 A.2d 148, 157 (Del. 1982).  Courts have repeatedly applied this principle to deny

injunctive relief to parties—like Plaintiffs—whose own lack of diligence resulted in their failure to comply with bylaw requirements.  *See Rosenbaum I*, 2021 WL 4775140, at *2 (denying injunction where plaintiff played "fast and loose" with disclosures "on the eve of the deadline"); *Bay Capital*, 2020 WL 1527784, at *8 n.78 (denying injunction where plaintiff "blew the deadline" to notice a nomination as a record shareholder); *Saba*, 224 A.3d at 979-80 (denying injunction where plaintiff "misread" an "unambiguous deadline").  Here, Plaintiffs' failure to comply with FRBK's unambiguous advance-notice requirements was entirely self-inflicted.  Equity would not be served by rewarding Plaintiffs' lack of diligence.

Additionally, the public interest is served by preserving the status quo.  "[W]here as in the instant case, the injunctive relief being sought is not directed merely at preserving the status quo but at altering the status quo, the burden on the moving party is particularly heavy."  *Sellaro v. Glenn*, No. 87-4872, 1988 WL 96803, at *2 (E.D. Pa. Sept. 14, 1988).  Plaintiffs attempt to obfuscate the relief sought by claiming that a preliminary injunction would "restore" the status quo.  In fact, Plaintiffs seek to create a new reality in which the Board's prerogatives and obligations are written out of the Company's organizational documents.  The record-ownership requirement has been in the Company's Charter and By-Laws for many years.  Mandating that Mr. Braca's nomination be accepted notwithstanding that Philip Norcross was not a record owner would *not* restore the status quo.  The rights to set a reasonable schedule for a shareholders' meeting or to determine the Board's size are also Board powers of long standing.  Far from restoring the status quo, Plaintiffs' requested relief would "create[] a reality that never existed among [the corporation's] directors and shareholders" and bestow Plaintiffs with "protections far beyond those enumerated in any of the corporate governance documents."  *Anchel v. Shea*, 762 A.2d 346, 355 (Pa. Super. Ct. 2000).

Further, granting the dramatic, mandatory injunction that Plaintiffs seek here would harm the Company and its shareholders. Permitting *ad hoc* exceptions to the record-holder requirement for shareholder nominations, as Plaintiffs urge, would damage the integrity of FRBK's election process and result in shareholder confusion as to the well-established rules for the nomination process. "[T]he Board ha[s] a genuine interest in enforcing its Bylaws so that they retain meaning and clear standards that stockholders must meet." *Lee*, 2022 WL 453607, at *18; *see also* Madonna Decl. ¶ 34; Jacobs Decl. ¶ 34. Likewise, the mandatory injunction Plaintiffs seek would reverse considered determinations of the Company's Board designed, in the directors' judgment, to best serve shareholders with respect to the Board's size, *see supra* at Part IV(A)(3), the dates and deadlines for the upcoming Annual Meeting, *see supra* Part IV(A)(2), and the appointment of Ben Duster as an interim director and as Audit Committee Chair, *see supra* Part IV(A)(4).

The dramatic changes to the status quo urged by Plaintiffs would cause significant damage to a Company that is seeking to stabilize itself after a tumultuous year that has seen a Board stymied by a deadlock, the later departure of its CEO and half its Board once that deadlock was broken, delayed periodic reports, and a series of costly and distracting lawsuits. Far from seeking to help remedy the situation, Plaintiffs seek to exploit it to advance their own interests to the detriment of the shareholders generally. Far from advancing the public interest, the order Plaintiffs seek runs precisely in the opposite direction.

///

///

///

///

///

41

**V.      Conclusion**

For the reasons set forth above, and as will be presented at the hearing, Defendants respectfully request that the Court deny the motion for preliminary injunction.

**SPECTOR GADON ROSEN VINCI P.C.**

Dated:  December 28, 2022                    /s/ *George M. Vinci, Jr.*
George M. Vinci, Jr., Esquire (ID #52645)
Alan B. Epstein, Esquire (ID #2346)
David B. Picker (ID #65153)
Neal R. Troum, Esquire (ID #94572)
1635 Market Street, 7th Floor
Philadelphia, PA  19103
(215) 241-8888 / FAX- (215) 241-8844
gvinci@sgrvlaw.com,
aepstein@sgrvlaw.com;
dpicker@sgrvlaw.com;
ntroum@sgrvlaw.com

*Attorneys for Defendants*

OF COUNSEL:

**VINSON & ELKINS LLP**
Michael L. Charlson* (CA Bar 122125)
Meghan Natenson* (CA Bar 312634)
555 Mission Street, Suite 2000
San Francisco, CA 94105
Phone: 415-979-6910
mcharlson@velaw.com
mnatenson@velaw.com

Marisa Antonelli* (NY Bar 4789848)
1114 Avenue of the Americas, 32nd Floor
New York, New York 10036
Phone: 212-237-0151
mantonelli@velaw.com

*\*Admitted pro hac vice*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on December 28, 2022, a true and correct copy of the foregoing

Opposition was served on all counsel of record via the Court's ECF system.

<u>*/s/ George M. Vinci Jr.*</u>
George M. Vinci, Jr.
