## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| George E. Norcross, III, Gregory B. Braca, and Philip A. Norcross,<br><br>Plaintiffs,<br><br>vs.<br><br>Republic First Bancorp, Inc., Harry Madonna, Andrew B. Cohen, Lisa Jacobs, Harris Wildstein, Peter B. Bartholow, and Benjamin C. Duster, IV,<br><br>Defendants. | : : : : : : : : : : : : : : : : : | **CIVIL ACTION NO. 22-cv-04953 (PD)** |

## REPLY BRIEF IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**BALLARD SPAHR LLP**
M. Norman Goldberger
Adrian R. King, Jr.
Laura E. Krabill
Shawn F. Summers
1735 Market Street, 51st Floor
Philadelphia, PA 19103

*Attorneys for Plaintiffs George E. Norcross, III, Gregory B. Braca, and Philip A. Norcross*

OF COUNSEL:
Brian T. Frawley
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004-2498

Dated: January 4, 2022

## <u>TABLE OF CONTENTS</u>

**<u>Page</u>**

I.    INTRODUCTION.......................................................................................... 1

II.    ARGUMENT ............................................................................................... 3

    A.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF
        THEIR CLAIMS................................................................................ 3

        1.    Defendants' Reduction of the Board Was a Violation of Plaintiffs'
            Right to Engage in a Proxy Contest and Shareholder Voting
            Rights........................................................................................ 3

        2.    Defendant Duster Was Not a Valid Director. .......................................... 8

        3.    Defendants' Rejection of Plaintiffs' Nomination Was a Bad-Faith
            Infringement of Plaintiffs' Right to Engage in a Proxy Contest and
            Shareholder Voting Rights. ......................................................... 9

    B.    Plaintiffs Seek a Prohibitory Injunction and Meet the Other Prongs of the
        Test for its Entry. ............................................................................20

    C.    Defendants' Allegations Cry Out for Challenge Under Cross-Examination. .......23

III.    CONCLUSION..........................................................................................24

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Allegheny Energy, Inc. v. DQE, Inc.*,
   171 F.3d 153 (3d Cir. 1999) ........................................................... 5, 24

*Berckeley Inv. Group, Ltd. v. Colkitt*,
   455 F.3d 195 (3d Cir. 2006) .............................................................. 23

*Driver Opportunity Partners I, LP v. Republic First Bancorp, Inc.*,
   No. 22-1694 (E.D. Pa.e 2022) .......................................................... 20

*EUSA Pharma (US), Inc. v. Innocoll Pharms. Ltd.*,
   594 F. Supp. 2d 570 (E.D. Pa. 2009) ............................................... 21

*High River Ltd. P'ship v. Mylan Labs., Inc.*,
   383 F. Supp. 2d 660 (M.D. Pa. 2005) ............................................... 19

*Hill v. Republic First Bancorp, Inc.*,
   No. 22-1924 (E.D. Pa. 2022) ......................................................... 1, 24

**State Cases**

*AB Value Partners, LP v. Kreisler Mfg. Corp.*,
   No. 10434-VCP, 2014 Del. Ch. LEXIS 264 (Del. Ch. Dec. 16, 2014) ................................ 15

*Jewelcor Mgmt., Inc. v. Thistle Grp. Holdings, Co.*,
   60 Pa. D. & C.4th 391 (Phila. C.P. 2002) ....................................... 7, 20

*Openwave Sys. v. Harbinger Capital Partners Master Fund I, Ltd.*
   924 A.2d 228 (Del. Ch. 2007) ............................................................. 7

*Pell v. Kill*,
   135 A.3d 764 (Del. Ch. 2016) .................................................... 7, 8, 20

*Schnell v. Chris-Craft Industries, Inc.*,
   285 A.2d 437 (Del. 1971) .................................................................. 14

*Strategic Inv. Opportunities LLC v. Lee Enters.*,
   No. 2021-1089-LWW, 2022 Del. Ch. LEXIS 34 (Del. Ch. Feb. 14, 2022) ............... 15, 16, 18

**State Statutes**

15 Pa. C.S. § 1724(b) ...........................................................................6

**Rules**

Rule 14a-8..........................................................................................................................17

## I.    INTRODUCTION

After spending the better part of the past year engaged in "illegal," "oppressive," and "fraudulent" conduct to seize control of the Board and take actions that harm the Company's shareholders for their own self-interest,[1] Defendants ask this Court to accept their bald assertions (carefully crafted by counsel and not subject to cross-examination) that they did not engage in any efforts to entrench themselves, undermine Plaintiffs' proxy contest or infringe shareholders' voting rights. The clear, unequivocal facts prove otherwise.

- When the first board seat was vacated in 2022, Defendants insisted that they (rather than the Company's shareholders) pick a director to fill that seat.

- At that time, Defendants appointed Benjamin Duster to the board. They tout that decision as negating any suggestion of entrenchment, telling this Court that Mr. Duster was selected because of his independence and that he has no ties to any of the other Defendants. That is not true. In fact, Mr. Duster (who was never a legitimate director due to his lack of share ownership) has deep connections with Defendant Andrew Cohen, dating back to at least 2006. (*See* Declaration of Adrian R. King submitted herewith ("King Decl.") ¶ 4, Ex. C (June 1, 2006 Neenah Foundry Co. Form 8-K ("The board of directors of ACP consists of five directors. Under the Stockholders Agreement, MacKay Shields designated two members to the board of directors and CM-III and TCW each designated one member to the board of directors. The MacKay Shields designees were Andrew B. Cohen and Benjamin C. Duster, IV, Esq. . . .")))

- After three other board members resigned, rather than hold a special shareholder meeting to fill those vacancies as Plaintiffs requested, Defendants delayed for months hoping to use the seats as bargaining chips.

- In October, again, without any input from or vote of shareholders, Defendants appointed Peter B. Bartholow to fill one of the empty seats.

- Defendants again claim this evidences their lack of entrenchment, but the truth is Mr. Bartholow was appointed specifically to buy one dissident shareholder's silence and support.

- After months of failing to fill two other board vacancies, and with the 2022 annual shareholder meeting on the horizon where the shareholders would finally have the

---

[1]    Order at 6-10, Dkt No. 15, *Hill v. Republic First Bancorp, Inc.*, No. 22-1924 (E.D. Pa. May 26, 2022).

opportunity to fill at least one of the empty seats, Defendants reduced the size of the board and eliminated the empty seat up for election at the 2022 annual meeting.

- Defendants also eliminated another vacant board seat that was required to be filled imminently under the Company's Bylaws and was the subject of Plaintiffs' special meeting request, again preventing the Company's shareholders from exercising their franchise rights.

- Then, only one month later, Defendants expanded the board again so they could hand select another new director of their choosing without allowing shareholders to vote.

- And, when Plaintiffs finally had the chance to nominate a candidate to give shareholders a choice in a contested election, Defendants rejected the nomination on what is at most a technicality—that Plaintiff Philip Norcross was not a "record holder" of shares despite having accepted his record ownership three times before, inducing him to believe that he was a record holder—and despite knowing full well that Plaintiffs are owners of almost 10% of the Company's stock.

These are actions of a Board taking every possible step to entrench themselves and prevent the shareholders from exercising their franchise rights in a free and fair election.

Defendants' brief tries to shift the focus away from their manipulation and rigging of the board election by blaming Plaintiffs for their purported failings. But try as they might, Defendants cannot hide from the facts and the law. Defendants violated Pennsylvania law with their board entrenchment scheme to avoid Plaintiffs' proxy contest and then manipulated the nomination process, inducing Plaintiffs to rely on their record ownership and rejecting their nomination based on a technical defect in bad faith. Defendants admit (indeed, emphasize) that Plaintiffs could have easily resolved the record ownership issue had Defendants been honest with Plaintiffs, who they know are significant shareholders owning almost 10% of the Company's stock. Defendants' bad-faith manipulations establish Plaintiffs' likelihood of success on their claims.

Further, Plaintiffs can and will proceed with their proxy contest as soon as their right to nominate their director candidate is established by the Court. Contrary to Defendants' assertion, Plaintiffs received approval to solicit proxies for their candidate from the Pennsylvania banking

department on December 16, 2022—the same day the state court was scheduled to hear this injunction motion.  Plaintiffs have not filed a preliminary proxy statement because, unlike Defendants, Plaintiffs do not believe it is appropriate to foment confusion among shareholders and the marketplace with SEC filings until their rights are established.  Plaintiffs would have had sufficient time to wage a proxy contest had Defendants not manipulated the judicial system with their belated removal, just as they manipulated the board composition and election process.

Courts regularly recognize that violation of shareholder voting rights in an election of directors causes immediate and irreparable harm and warrants injunctive relief to prevent an invalid shareholder meeting and vote. Plaintiffs are entitled to that relief here.

## II.    ARGUMENT

### A.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.

#### 1.    Defendants' Reduction of the Board Was a Violation of Plaintiffs' Right to Engage in a Proxy Contest and Shareholder Voting Rights.

Defendants try to sweep their improper board reduction scheme under the rug with claims that the Board was simply exercising reasonable corporate governance judgment to make the number of board seats equal the number of sitting directors. (Def. Br. 31–32). The undisputed facts laid out in the public forum belie Defendants' claims and litigation-induced justification for their actions.

As this Court is aware, one of the Company's directors, Theodore Flocco, died in May 2022. (Compl. ¶ 9). Defendants did not reduce the number of Board seats when Mr. Flocco died. Instead, they fought to prevent shareholders from being able to elect Mr. Flocco's replacement so they could hand pick Mr. Duster to fill that seat. (Compl. ¶¶ 76–77).  Further, contrary to Defendants' claims now in this Court that Mr. Duster was selected because he "lives across the country" and had no affiliation with the Company or any of its directors (Def. Br. 8, 13, 33 n.21),

Mr. Duster is in fact one of Defendant Andrew Cohen's long-time colleagues. (*See* King Decl. ¶ 4, Ex. C (June 1, 2006 Neenah Foundry Co. Form 8-K ("The board of directors of ACP consists of five directors. Under the Stockholders Agreement, MacKay Shields designated two members to the board of directors and CM-III and TCW each designated one member to the board of directors. The MacKay Shields designees were Andrew B. Cohen and Benjamin C. Duster, IV, Esq. . . .")); *see also* King Decl. ¶ 5, Ex. D (Matt Fazelpoor, *Hill Resigns as Republic First CEO; New Director Named*, NJ BIZ (July 8, 2022) ("'Tonight, four members of the Cohen/Madonna faction dispensed with all semblance of corporate governance to push their nominee, Ben Duster, who has multiple business interests in which Steven A. Cohen has invested, onto the Board of Republic First,' the Hill faction said in a statement.")))[2]

Defendants also did not reduce the number of Board seats when Mr. Hill and Mr. Spevak resigned in August 2022. (Compl. ¶¶ 11, 79). Indeed, they held those seats open to use them as bargaining chips in their effort to quell dissent from dissident shareholders who intended to offer the Company's shareholders alternative director candidates who could have altered the dynamics of the Board and the direction of the Company. Defendants did not eliminate those seats (or fill them) within the Bylaws' 60-day time period to do so. (Compl., Ex. 1 ("Bylaws"), Art. II, § 7). Defendants did not schedule a special shareholder meeting to fill those seats despite Plaintiffs' repeated requests for one. (Compl. ¶¶ 14, 97). Ultimately, after the 60-day window, Defendants successfully conferred one of those seats on Mr. Bartholow to buy silence and support from one dissident group, Driver Management ("Driver"). (Compl. ¶ 94 & Ex. 18). As the Company's own

---

[2]  As Defendants' preliminary proxy admits, Andrew B. Cohen has been "the Chief Investment Officer and Co-Founder of Cohen Private Ventures since 2014, which invests long-term capital primarily in direct private investments and other opportunistic transactions, and manages family office activities, on behalf of Steven A. Cohen and his family. . . ." (King Decl. ¶ 6, Ex. E (Dec. 27, 2022 PRER14A), at 14).

public reporting showed, the price for the seat was that Driver would not offer any other director candidates and would support the decisions of the Board. (*Id.*) Thus, far from undermining Plaintiffs' entrenchment claims as Defendants would have the Court believe (Def. Br. 32), Defendants' appointment of Mr. Bartholow suppressed dissent and resulted in a new board member who was essentially obligated to follow the Defendants' lead.

Defendants also did not reduce the number of Board seats when Mr. Tierney resigned in mid-September. (Compl. ¶ 11). They also failed and refused to call a special shareholder meeting to fill Mr. Tierney's seat despite Plaintiffs' repeated requests to do so. (*Id.* ¶ 14).

Instead, only at the same time Defendants were scheduling the long-overdue 2022 annual meeting where the Company's shareholders would finally have the opportunity to vote to fill one of the vacant board seats (and Plaintiffs would have the ability to nominate a director candidate to run for that seat)—only then—did Defendants determine "for business reasons" and with no intent "to entrench themselves or limit stockholder rights" (Def. Br. 13), that they should eliminate the two vacant seats. Defendants' carefully crafted declarations are frankly not credible on their face.[3]

Even more recent actions by Defendants have further cemented their illegitimate manipulation of the board composition. Despite eliminating two board seats in November 2022—one that was required to be filled by November 19 under the 60-day Bylaws provision and which was the subject of Plaintiffs' special meeting request, and the other that was already beyond the 60-day window and which would have been up for election at the 2022 annual

---

[3]  Defendants cannot defeat Plaintiffs' motion through self-serving declarations without, at the very least, submitting their claims to the cross-examination they evaded by removing the case to this Court. *See Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 167 n.19 (3d Cir. 1999) (reversing the trial court's denial of a preliminary injunction and noting that it should have held an evidentiary hearing with cross-examination since "affidavits often provide a poor substitute for live testimony").

meeting—on December 22, 2022, Defendants announced that they had re-expanded the board to seven seats and inserted another hand-selected director without any input or vote of the shareholders.  (King Decl. ¶ 3, Ex. A (Dec. 22, 2022 Form 8-K)).  Defendants themselves point out their latest maneuver in an effort to moot their violation of the Bylaws and Pennsylvania law in eliminating the two board seats in November, rendering the classified board uneven, with one Class I directors, three Class II directors and two Class III directors, (Def. Br. 12 n.3 & 32 n.20), as displayed in the following table:

**Board after November 4, 2022 Reduction**

| Class I (term ends 2023) | Class II (term ends 2024) | Class III (term ends 2022) |
| --- | --- | --- |
| Madonna | Cohen<br><br>Jacobs<br><br>Wildstein | Duster<br><br>Bartholow |

Under the Company's Articles of Incorporation, (Compl., Ex. 2 ("Articles"), Art. VII, §§ B, C), and Pennsylvania law, upon their "reduction" of the number of board seats, Defendants had an obligation to re-classify one of the three Class II directors as a Class I director to maintain the six-member Board in classes "as nearly equal as possible." 15 Pa. C.S. § 1724(b).  Instead, Defendants continued to maintain an uneven board so they could later fill a Class I seat with a director of their choice while avoiding the shareholders' judgment on a Class III director at the 2022 annual meeting.  The appointment of a new Class I director does not moot the initial violation and, in fact, is a separate violation of Pennsylvania law.

The facts show that Defendants' reduction of the number of board seats was clearly a defensive measure in the face of Plaintiffs' proxy contest, designed to undermine the voting rights of Plaintiffs and all Company shareholders.  Defendants nonetheless claim they can avoid liability

with self-serving claims that the reduction was simply "good corporate governance," in reliance on *Openwave Sys. v. Harbinger Capital Partners Master Fund I, Ltd*. (Def. Br. 31). Defendants completely misrepresent the case to this Court. *Openwave* in fact shows just the opposite. There, the court scrutinized the board's reduction in the number of board seats and found that it did not violate shareholder voting rights specifically because the reduction "occurred nearly two months before [the activist shareholder] launched its proxy contest . . . . The testimony at trial also demonstrated that, at the time of the November 1, 2006 board meeting [when the reduction occurred], none of the board members considered [the shareholder] to be a threat and had not considered the possibility of a proxy fight." 924 A.2d 228, 243 (Del. Ch. 2007). In fact, the court went on to conclude: "If [the shareholder] had filed a Schedule 13D [suggesting its intent to wage a proxy fight] rather than a Schedule 13G, the board's action in eliminating the vacant seat might well be subjected to more searching scrutiny." *Id*. Here, where Plaintiffs not only filed Schedule 13Ds repeatedly but also clearly and unequivocally expressed their intention to engage in a proxy contest consistently since February 2022, *Openwave*, demonstrates that Defendants' board reduction scheme implemented in the face of a proxy contest cannot be justified through Defendants' self-serving claims of "good corporate governance." In fact, as Plaintiffs' opening brief explains in detail, this case is on all fours with *Pell v. Kill*, 135 A.3d 764 (Del. Ch. 2016), where the Delaware Chancery Court (V.C. Laster) enjoined a board reduction scheme just like the one Defendants adopted here as a bad faith violation of shareholder voting rights when it was implemented in the midst of a proxy contest. *Id*. at 769–70.

The board reduction scheme was a clear violation of Pennsylvania shareholder voting rights under *Jewelcor Mgmt., Inc. v. Thistle Grp. Holdings, Co.,* 60 Pa. D. & C.4th 391 (Phila. C.P. 2002) (enjoining board from advancing date of shareholder meeting in the midst of a proxy

contest) and *Pell*, 135 A.3d 764.  This alone warrants injunctive relief in Plaintiffs' favor to stop the Board from implementing the reduction, which in turn requires re-opening the nomination window to allow shareholders to nominate directors for the three Class III board seats that were (and should have continued to be) up for election at the 2022 annual meeting.

### 2.    Defendant Duster Was Not a Valid Director.

Second, Defendants contort the Company's Articles and Bylaws in a desperate attempt to hide the fact that they enforce the Company's governing documents arbitrarily and only when it suits their goal of retaining power and suppressing shareholder rights.  (Def. Br. 33–34).

As Plaintiffs established (and Defendants admit), Defendant Duster did not own any shares of Company stock when he was appointed to the Board and, in fact, appears to have only recently purchased 100 shares from one of his fellow Defendants in an effort to avoid Plaintiffs' claims here.  (Def. Br. 8 & n.2).  The Bylaws are clear and unequivocal—all directors must be shareholders of the Company when they begin to serve.  In particular, Article II, Section 2 of the Bylaws states:  "A director need not be a citizen of the United States or a resident of the Commonwealth of Pennsylvania but must be a shareholder of the Corporation at the commencement of his term."  (Bylaws, Art. II, § 2).  This Bylaw provision is not limited to directors elected by shareholders and indeed references directors elected to fill vacancies.  (*Id.*)

Rather than simply acknowledge that Duster should have been a shareholder before being appointed to the Board, Defendants suggest that a director appointed by the Board to fill a vacancy is somehow exempt from that fundamental requirement.  (Def. Br. 33).  Whether a director starts their "term" at an annual meeting or some other time due to a vacancy, Article II, Section 2 requires the director be a shareholder "at the commencement of his term."

Defendants' selective adherence to the Company's Articles and Bylaws, including with respect to Board membership and requirements, highlights that their enforcement of a technical

bylaw provision to preclude Plaintiffs' nomination was done, not due to some abiding sense of duty to uphold the Company's governing documents as Defendants contend, (*see* Def. Br. 12), but in bad faith to suppress Plaintiffs' proxy contest and shareholders' rights to vote in a contested election.   Duster's participation in that decision as an illegitimate board member renders Defendants' bad faith board actions void as a matter of law, entitling Plaintiffs to relief on their claims.

### 3. Defendants' Rejection of Plaintiffs' Nomination Was a Bad-Faith Infringement of Plaintiffs' Right to Engage in a Proxy Contest and Shareholder Voting Rights.

Defendants spend the vast majority of their brief (as well as purported expert reports and Board declarations) attempting to justify their rejection of Plaintiffs' nomination of Mr. Braca as a candidate for the board despite accepting Philip Norcross as a record owner three times before and knowing that Plaintiffs collectively own almost 10% of the Company's stock. (Def. Br. 11–12, 16–30).   Defendants have waived and are estopped from rejecting Plaintiffs' nomination and cannot justify their actions based on purported adherence to the Company's "advance notice" bylaw provisions.

### i. Defendants Waived and Are Estopped from Rejecting Plaintiffs as Record Owners.

Defendants' own brief and submissions bolsters Plaintiffs' position and entitlement to relief.   First, Defendants repeatedly emphasize how easily and quickly Plaintiffs could have obtained record ownership of Company stock—claiming they could have done so in as little as 24 to 48 hours. (Def. Br. 2, 19; Expert Report of Richard Grubaugh ¶ 4).[4]   This only proves that

---

[4] Since Defendants' rejection of the Plaintiffs board nomination, Plaintiff Philip Norcross has become the record holder of 100 shares of Company stock. Contrary to Defendants' claims, however, the Company's transfer agent took 20 days after receiving all information from Mr. Norcross's broker to confirm the transfer of stock into record holder name. Defendants should know this since it is *their agent* that controls the process.

Plaintiffs genuinely believed that Mr. Norcross was a record owner of stock—otherwise he would have gone through the simple and quick process of obtaining record shares. Mr. Norcross reasonably and justifiably believed he was a record holder because Defendants repeatedly treated him as one in accordance with the letters submitted by his broker and accepted by the Company. (*See* Compl. ¶¶ 75 & n.3, 99, 115–18). Defendants therefore waived any right to contest Mr. Norcross' record holder status. The fact that they did so only when it really counted—the nomination of a director candidate for the long-delayed 2022 annual shareholder meeting—is strong evidence of Defendants' bad faith, consistent with their other concerted efforts to stymie Plaintiffs' proxy contest. Defendants' own submission also demonstrates their bad faith in waiting to reject Plaintiffs' nomination until two days after the deadline since, according to Defendants, Plaintiffs could have easily cured the defect by obtaining record shares had Defendants alerted them to their position earlier.

Defendants attempt to side-step their repeated acceptance of Mr. Norcross as a record owner (and the effect that they waived and are estopped from contending otherwise in connection with his nomination) by placing blame on the custodian appointed by this Court and claiming that they did not know about and had nothing to do with his decisions. (Def. Br. 24–25). First, Defendants completely ignore that they themselves accepted Mr. Norcross's record ownership just weeks before the nomination in connection with his October 25 books and records request. (Compl. ¶ 99). There is no dispute that Defendants were in charge of the Company at that time, and their counsel agreed to provide the documents Plaintiffs sought without questioning Mr. Norcross' record ownership. (*Id.* & Exs. 21 & 22). That alone estops Defendants from denying Philip Norcross the right to nominate a director candidate. Defendants want it all ways, recognizing Mr. Norcross as a shareholder when it suits their purpose, apparently in this case to

lull Mr. Norcross into believing the Company accepted him as a record shareholder, while at the same time denying that status to play "gotcha"—"we did not mean it; you are not a record shareholder." Second, Defendants fail to acknowledge that both of the prior submissions made by Mr. Norcross as record owner of Company stock (Mr. Norcross' first books and records request and his nomination of Mr. Braca for election at the special meeting scheduled by the custodian) were specifically addressed and delivered to Defendant Jacobs, the Company's corporate secretary. (Compl. ¶¶ 75 & n.3 & Exs. 7–10).[5] As the Company's preliminary proxy states, upon Ms. Jacobs' receipt of communication from shareholders, the Company policy is for her to distribute the communication to the Board. (*See* King Decl. ¶ 6, Ex. E (Dec. 27, 2022 PRER14A), at 24). Defendants had actual notice of Plaintiffs' evidence of record ownership and failed to dispute it at any time before Plaintiffs nominated a director candidate for the annual meeting.

Defendants also contend that Plaintiffs could not reasonably rely on their conduct and actions to believe that Mr. Norcross was a record holder because they provided a record shareholder list to him twice. (Def. Br. 23–24). The first time was on July 5, 2022, right before the Third Circuit ruled in Defendants' favor, allowing them to appoint a new director to replace Mr. Flocco. (Def. Br. 9). Defendants immediately cancelled the special shareholder meeting scheduled by the custodian to hold the election for that seat. (*Id.*) As Plaintiffs explained, the shareholder list provided seemed inaccurate and incomplete as it noted that it had selected exactly 100 shareholders, but with the meeting cancelled, the need for the list (to solicit proxies in advance

---

[5] In fact, in denying any knowledge of or involvement in the prior demands, Defendants specifically rely on Defendant Jacobs' declaration, claiming she only "later learned" of the June 2022 books and records request and Philip Norcross's nomination of Plaintiff Braca in connection with the special shareholder meeting noticed by the custodian. (*See* Def. Br. 9 (citing Jacobs Decl. at ¶ 14) (Jacobs claiming "the Board was unaware of, and was not involved in reviewing or considering, either the books and records request or Philip Norcross's nomination")).

of the special shareholder meeting election) was moot.  Defendants' own submission demonstrates that Defendants have far greater access to the Company's record shareholder list, and Plaintiffs were justified in relying on Defendants' conduct and responses in accepting them as record holders, rather than a seemingly incomplete list.  Among other things, Defendants admit that their transfer agent retains the official record shareholder list and will provide it to Defendants, but not others, on demand.  (Def. Br. 1 ("Company's stock ledger maintained by the Company's transfer agent"), 9, 11–12 & Charlson Decl.).  Indeed, Defendants submitted multiple versions of the list to this Court, marked as confidential and filed under seal to prevent shareholders from having access to information that should be freely available.  (Charlson Decl.) Defendants' own affidavits also demonstrate the lack of clarity of the lists Defendants' transfer agent provided, demonstrating that Plaintiffs' failure to rely on the list was entirely justified.  Specifically, Defendant Madonna himself submitted a declaration claiming that he believed the record holder list the Company received from its transfer agent showing record holders on November 11, 2022 may have had errors and therefore requested a second list dated November 14.  (Madonna Decl. ¶ 28; Def. Br. 11–12).

And, finally, Defendants admittedly did not provide the shareholder list requested by Plaintiffs' second books and records request (sent October 25) until November 11—the day Plaintiffs' nomination was submitted and only one business day before the nomination deadline they imposed.  (Def. Br. 11).  Even accepting Defendants' own contention that it would only take 24 to 48 hours for Plaintiffs to obtain record ownership, the most reasonable inference to draw is that Defendants withheld the shareholder lists until they knew it would be too late for Plaintiffs to obtain record shares before the nomination deadline.  Thus, providing the list a second time on the

eve of the nomination deadline does nothing to undermine Plaintiffs' waiver and estoppel arguments.

### ii.    Defendants Cannot Reject the Nomination in the Name of Enforcing "Advance Notice" Provisions

Defendants' claims that they are merely abiding by the governing documents and upholding shareholders' rights by requiring record ownership to submit a board nomination (*see* Def. Br. 40–41), again mischaracterize the Articles and Bylaws. Both the Articles and Bylaws make plain that any nomination by shareholders may be accepted by the Board and there is no mandatory record ownership requirement. Instead, both the Articles and Bylaws make rejection or acceptance of any nomination, regardless of its compliance with any specific notice provision, completely discretionary. Specifically, Article II, Section 4 of the Bylaws states: "The chairman of any meeting of shareholders to elect directors and the Board of Directors *may* refuse to recognize the nomination of any person not made in compliance with the foregoing." (Bylaws Art. II, § 4 (emphasis added)). The Articles of Incorporation are identical. (Articles, Art. VII(D)). Thus, contrary to Defendants' claims, there is no requirement that they refuse Plaintiffs' nomination to uphold some contractual obligation to shareholders. They rejected the nomination, not out of an allegiance to the governing documents (which, as discussed above, they freely ignore or violate when it suits them), but to entrench themselves and defeat Plaintiffs' proxy contest without a fair election.

Defendants' claimed need to enforce the record ownership requirement to ensure that Plaintiffs were, in fact, shareholders is also complete pretext. Defendants themselves have acknowledged repeatedly for months (including in their preliminary proxy filed with the SEC) that Plaintiffs own almost 10% of the Company's stock. Plaintiffs have filed multiple Schedule 13D's with the SEC recounting in detail their ownership interests, including the date of purchase and

amount of shares.  Plaintiffs provided with their nomination notice the most recent Schedule 13D as well as a letter from Mr. Norcross' broker (and other supporting documents) establishing Plaintiffs' ownership of over 6.3 million shares (constituting 9.9% of the Company's outstanding shares).  And, Plaintiffs have made multiple proposals to the Board seeking to increase their ownership above the 10% threshold set forth in Article XII of the Company's Articles.  Defendants do not genuinely doubt Plaintiffs are shareholders of the Company.  Instead, they are applying a very technical reading of the governing documents in bad faith and solely to entrench themselves and avoid a free and fair election.   Under those circumstances, their rejection of Plaintiffs' nomination cannot stand.

Defendants devote a significant portion of their brief defending, in the abstract, the concepts of advance notice and record holder requirements for the nomination of directors.  (*See* Def. Br. 16–22).  Plaintiffs do not contend that the Company's advance notice provisions are invalid on their face.  Plaintiffs do object to the specific circumstances of Defendants' application of those provisions, by imposing a shortened notice period after a delayed shareholder meeting and without providing critical information that would inform shareholders of facts necessary to their rights and by selectively enforcing a record holder limitation after engaging in other bad faith conduct clearly designed to defeat Plaintiffs' proxy contest.  The cases Defendants rely on to justify the "advance notice" provisions of the Articles and Bylaws do not aid their claim in these circumstances.  To the contrary, the cases Defendants themselves cite acknowledge that adherence to notice provisions in the nomination process is no defense where the defendants have acted in bad faith to undermine the shareholder franchise—"inequitable action does not become permissible simply because it is legally possible."  *Schnell v. Chris-Craft Industries, Inc.*, 285 A.2d 437, 439 (Del. 1971).

For instance, *AB Value Partners, LP v. Kreisler Mfg. Corp.*, relied on by Defendants, describes multiple circumstances where Delaware courts enjoin enforcement of advance notice provisions in cases just like this. Among other reasons, "if notice requirements 'unduly restrict the stockholder franchise or are applied inequitably, they will be struck down.'" No. 10434-VCP, 2014 Del. Ch. LEXIS 264, at *8 (Del. Ch. Dec. 16, 2014) ("clearest set of cases providing support for enjoining an advance notice bylaw involves a scenario where a board, aware of an imminent proxy contest, imposes or applies an advance notice bylaw so as to make compliance impossible or extremely difficult, thereby thwarting the challenger entirely"). *Strategic Inv. Opportunities LLC v. Lee Enters.*, No. 2021-1089-LWW, 2022 Del. Ch. LEXIS 34, at *22 (Del. Ch. Feb. 14, 2022), also relied on by Defendants, likewise notes that technical violations of bylaws provisions will not justify rejecting a nomination where a board acts in bad faith. In particular, the Court held: "The court's analysis does not necessarily end if a stockholder fails to comply with the plain terms of an advance notice bylaw. If circumstances require, the court will go on to consider whether the fiduciaries' actions were unreasonable or inequitable. Equity will prohibit, for example, attempts to 'utilize the corporate machinery' for the 'purpose of obstructing the legitimate efforts of dissident stockholders in the exercise of their right to undertake a proxy contest against management.'" *Id.* In that case, the court concluded that "[t]he Board did not unfairly apply those Bylaws or engage in inequitable conduct that made [shareholders'] compliance difficult." *Id.* at *39. That is not the case here.

Instead, in this case, the evidence of Defendants' bad-faith obstruction of Plaintiffs' proxy contest and shareholder voting rights abounds. Defendants reduced the number of board seats to thwart Plaintiffs' proxy contest; they failed and refused to call special shareholder meetings to fill vacant board seats in derogation of shareholders' rights to select the stewards of their enterprise;

they seated a director owning no shares in violation of the company's governing documents; they paid off one dissident shareholder to obtain its support and avoid a contested election; they re-expanded the board, installing yet another new director but placed him in Class I to avoid having his seat be subjected to a vote at the long-delayed 2022 annual meeting; they accepted Plaintiffs' record ownership in three prior cases and waited until the director nomination for the annual meeting to challenge their status; and they set the nomination deadline for 10 calendar days, ending two days before Plaintiffs would have held their shares for one year and thus been able to nominate candidates as beneficial owners. Defendants, therefore, cannot utilize the "corporate machinery" of the "advance notice" provision to reject Plaintiffs' nomination in this case.

Moreover, in *Strategic Investment Opportunities*, the dissident shareholder knew that record ownership was required and failed to attempt to obtain it until it was too late to meet the nomination deadline. *Id.* at *37–38. It sought to obtain record shares and simultaneously asked Cede & Company to provide a cover letter for its nomination but refused to provide the nomination information (including the names of the nominees) to Cede & Company in order for it to make the nomination directly. *Id.* at *13–14. The company had done nothing to induce the shareholder not to take action to obtain record shares in time and had taken no board action while a proxy contest was threatened to undermine plaintiffs' rights to wage an election contest.

In stark contrast, as Defendants' implicitly concede, Mr. Norcross believed, based on his broker's written representations and the Company's actions, that he was a record owner of shares. Otherwise, as Defendants point out, Mr. Norcross could easily have obtained record ownership or gotten Cede & Company to make the nomination as record holder. There was no mad rush to obtain record shares or ask another record shareholder to submit the nomination. Plaintiffs did not sit on their rights; they justifiably believed they had taken the necessary steps to become record

holders well in advance of the nomination deadline and believed they had done so successfully thanks in large part to Defendants' actions in accepting them as record holders. And, here, the Board has taken numerous steps to impede Plaintiffs' proxy contest. Thus, the conclusion in *Strategic Investment Opportunities* provides no aid to Defendants and, in fact, supports Plaintiffs' claims here.

Finally, if Defendants insist on being hyper-technical about compliance with the Company's governing documents, Plaintiffs' nomination technically and expressly meets the provisions of the Articles and Bylaws. Contrary to Defendants' contention, any "record ownership" provision in the Articles and Bylaws is, at best, ambiguous. The Articles and Bylaws are identical in their provisions regarding shareholder nominations of directors and provide, "[a]t all Annual Meetings of shareholders commencing after the Annual Meeting of Shareholders to be held in 1996, if any, *any stockholder* who desires to propose nominees to the Board of Directors must provide for the receipt of a written notice of the intention to nominate a person or persons for election as directors by the Secretary of the Corporation: (i) with respect to an election to be held at any annual meeting of shareholders in accordance with the provision of Rule 14a-8, . . . ." (Articles, Art. VII(D); Bylaws Art. II § 4 (emphasis added)).[6]  Contrary to most record holder

---

[6]  Again, in describing this provision of the governing documents, Defendants intentionally mischaracterize and misconstrue the plain words. Defendants argue that the Bylaws do not allow beneficial shareholders to use Rule 14a-8 when making a director nomination, but instead only when submitting other types of shareholder proposals. (Def. Br. 26–28). That is just not true. The Bylaws have two separate provisions for shareholder submissions before an annual meeting. Article I, Section 11, entitled "Shareholder Proposal," provides that "any shareholder proposals with respect to an annual meeting shall be made in compliance with the provisions of Rule 14a-8." (Bylaws Art. I, § 11). Article II, Section 4 is entitled and relates specifically to "Nomination by Shareholders," and likewise provides that "any stockholder who desires to propose nominees to the Board of Directors" must do so "in accordance with the provisions of Rule 14a-8." (*Id*. Art. II, § 4). Defendants' contention that the rule can only be used for proposals that do not nominate candidates ignores the plain language and meaning of the Bylaws, as Defendants are wont to do when it suits them.

provisions of company bylaws, this sentence makes no reference to shareholder nominations being restricted to record holders. *See, e.g.*, *Strategic Inv. Opportunities*, 2022 Del. Ch. LEXIS 34, at *7 (reciting bylaw provision limiting nominations to be made by "any stockholder of the Corporation entitled to vote at the meeting who complies with the notice procedures set forth in this Section 2 and who is a stockholder of record at the time such notice is delivered to the Secretary of the Corporation"). Instead, the next paragraph of the Articles and Bylaws describes information that must be included with the nomination, including—among many other things like a description of any arrangements between the shareholder and any nominee, the qualifications of the nominee, and the consent of the nominee to serve—"a representation that the shareholder is a holder of record of stock entitled to vote at the meeting and intends to appear in person or by proxy at the meeting to nominate the person or persons specified in the notice." (Bylaws Art. II, § 4). As Defendants concede, Plaintiffs' nomination notice was submitted on time to the Secretary and provided all of the information required for a nomination. Defendants challenge the nomination only on the basis that, according to the Company's records, Mr. Norcross was not a record owner. But, Defendants do not and cannot dispute that Plaintiffs' notice had the specific representation required by the Articles and Bylaws—Mr. Norcross represented that he was a "holder of record of stock entitled to vote at the meeting." Defendants contend the statement was inaccurate, but do not dispute that it was included (nor do they dispute that Mr. Norcross genuinely believed it was true, as discussed above). Accordingly, Plaintiffs' nomination technically met the specific requirements of the Company's governing documents, and Defendants did not have the right to reject it at all.

### iii. Defendants' Nomination Deadline Was Unreasonable and Unenforceable

Plaintiffs' Complaint and opening brief show the myriad reasons that the nomination deadline imposed by Defendants was unreasonable. The deadline was only 10 calendar days after

notice of the meeting was published (including two weekends and a federal holiday); the deadline was before the Company reported any of its 2023 financials or other SEC required disclosures despite being 11 months into the year; and Defendants tilted the playing field in the middle of the short 10-day nomination window by eliminating two board seats, including one that was the subject of the ongoing nomination process. The short deadline also harmed Plaintiffs because, as they explain, with a longer time period they could have cured the purported defect in their nomination or had another record holder, like Cede & Company, make the nomination.

Defendants respond that Plaintiffs lack standing to complain about the short deadline because they submitted their nomination in time. (Def. Br. 29 n.18). Incredibly, the case Defendants cite for that proposition holds exactly the opposite. In *High River Ltd. P'ship v. Mylan Labs., Inc.*, 383 F. Supp. 2d 660 (M.D. Pa. 2005), plaintiff likewise claimed that an advance notice requirement imposed by the defendant was unreasonable but nonetheless submitted its nomination by the deadline. The Court rejected defendants' argument that plaintiff lacked standing where it met the deadline, finding:

> The complaint in this case clearly sets forth an "injury in fact." It alleges that High River has been deprived of its right--recognized under the BCL--to a reasonable opportunity to nominate the directors of a corporation in which it holds a substantial financial interest. This deprivation may be redressed by a judicial declaration that the amended bylaws are invalid and an injunction requiring Mylan to accept nominations submitted by High River outside of the advance notice period. Constitutional prerequisites to jurisdictional standing are satisfied. . . . With the opportunity to submit new nominations, High River will be in a strategically better position to review its current candidates--particularly in light of any publicity that they have received since they were announced--and to decide whether a change is in order. The loss of this opportunity--whether or not exercised--constitutes an injury in fact for which judicial redress is potentially available."

*Id.* at 664–65. The same is true here.

Plaintiffs have shown that the nomination window was unreasonable in light of the circumstances and are entitled to declaratory and injunctive relief to enforce their fundamental rights as shareholders under Pennsylvania law.

**B.    Plaintiffs Seek a Prohibitory Injunction and Meet the Other Prongs of the Test for its Entry.**

Defendants dispute that Plaintiffs meet the other standards for obtaining injunctive relief (the existence of immediate, irreparable harm, that the injunction preserves the status quo, and the balance of the equities). (*See* Def. Br. 34–41). As set forth in detail in Plaintiffs' opening brief, the infringement of shareholder rights to wage a proxy contest and vote in an election of directors is universally recognized as causing immediate and irreparable harm, warranting entry of an injunction to stop the misconduct and ensure a free and fair election. (*See* Mem. of Law In Support of Pl. Motion for Preliminary Injunction, Dkt. No. 5-7, at 34–35 (citing *Jewelcor*, 60 Pa. D. & C.4th at 408; *Pell*, 135 A.2d at 793)).

Defendants' bad-faith conduct also establishes that the equities and public interests favor preventing Defendants from violating shareholder voting rights in connection with a long-delayed annual shareholder meeting by granting injunctive relief.

Defendants' main contention is that Plaintiffs' proposed injunction is mandatory, rather than prohibitory, and thus Plaintiffs are not seeking to maintain the status quo. This again is untrue. As an initial matter, the cases Defendants cite for this proposition (*see* Def. Br., p. 16 n.6) are easily distinguishable. For instance, although this Court previously recognized that Driver asked for a mandatory injunction when it requested that this Court order the Company to convene its annual meeting, *see* Order, Dkt. No. 23, at 2–3, *Driver Opportunity Partners I, LP v. Republic First Bancorp, Inc.*, No. 22-1694 (E.D. Pa. May 13, 2022), there is a clear difference between forcing the Company to hold an annual meeting it did not schedule and barring Defendants from

implementing improper election rigging schemes and postponing a scheduled meeting to ensure Defendants do not benefit from their misconduct.

As is clear from the relief sought, Plaintiffs' injunction requests that Defendants be prohibited from enforcing the bad faith board reduction scheme they implemented (announced on November 7) and from enforcing their rigged nomination scheme to reject Plaintiffs' nomination. These are prohibitions on Defendants' bad faith misconduct that violates Plaintiffs' right to engage in a proxy contest and all shareholders' (including Plaintiffs') voting rights. Granting the relief would restore the parties to their positions as of November 4, 2022, before Defendants engaged in the misconduct that is the focus of Plaintiffs' claims. The 2022 annual shareholders' meeting would proceed with three Class III board seats up for election as the Company and all of its shareholders understood would be the case for the entire last year (actually, since the last annual shareholder meeting held in April 2021). That is the epitome of an injunction restoring the status quo. *See EUSA Pharma (US), Inc. v. Innocoll Pharms. Ltd.*, 594 F. Supp. 2d 570, 578 (E.D. Pa. 2009) (quoting *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) ("'Status quo' refers to 'the last, peaceable, noncontested status of the parties.'")).

Barring Defendants from implementing their improper board reduction scheme in the midst of a contested election will admittedly require re-opening the nomination window, as shareholders (including Plaintiffs) must have an opportunity to nominate candidates for the vacant Class III seat that Defendants sought to eliminate. This does not convert the injunction from prohibitory to mandatory—it is merely a consequence of precluding Defendants' from effectuating their illegal and inequitable scheme.

Defendants also contend repeatedly that injunctive relief is not warranted because Plaintiffs could not proceed with their proxy contest even if the Court ruled in their favor. In support,

Defendants claim that Plaintiffs delayed and therefore do not have a required approval from the Pennsylvania banking department to solicit proxies. (Def. Br. 3). Again, Defendants are wrong. As Plaintiffs' noted in their opening brief, they anticipated banking department approval by mid-December. That in fact happened. On December 16, 2022, the same day the state court was scheduled to hear Plaintiffs' motion, the Pennsylvania Department of Banking and Securities provided its approval. (King Decl. ¶ 2, Ex. A (letter granting approval)). Defendants should have received notification of that fact.

Defendants also criticize Plaintiffs for not yet filing a preliminary proxy statement with the SEC. (Def. Br. 35-36). Plaintiffs, unlike Defendants, do not think it is appropriate to make SEC filings that would likely confuse the Company's shareholders and the market in general. If Plaintiffs filed a preliminary proxy statement with the SEC, the filing would be public and suggest to the Company's other shareholders and the market in general that Plaintiffs' nomination of Mr. Braca was accepted and that shareholders will be able to cast their votes for him. Defendants, meanwhile, indicated in the Company's preliminary proxy that they will not only "disregard[]" any nomination from Plaintiffs, but that they also intend to effectively throw any shareholder votes for Plaintiffs' nominee(s) in the trash. (*See* King Decl. ¶ 6, Ex. E (Dec. 27, 2022 PRER14A)). Under these circumstances, Plaintiffs cannot be faulted for waiting until their rights are established in this case to file their preliminary proxy statement with the SEC.

Plaintiffs are prepared to file their preliminary proxy promptly after a ruling in their favor. Absent Defendants' bad-faith manipulation of the judicial process by removing this case shortly before the injunction hearing was scheduled to proceed in the state court, Plaintiffs would have likely filed their preliminary proxy in mid-December with sufficient time in advance of the January 26, 2023 meeting date to effectively wage their proxy contest to elect Mr. Braca. Defendants

cannot be allowed to profit from their misconduct in the courts and succeed in their illegal plot to undermine shareholder rights because they were able to forestall the day of reckoning on their actions.

Under these circumstances, the time required for SEC review of Plaintiffs' eventual preliminary proxy only strengthens Plaintiffs' argument that effective relief from this Court requires not only the relief Plaintiffs initially requested in the state court, but also an order requiring Defendants to delay the Company's annual meeting by at least sixty (60) days.

**C.      Defendants' Allegations Cry Out for Challenge Under Cross-Examination.**

While Plaintiffs believe that the evidence they provided amply establishes their right to the injunction they seek, if the Court is swayed at all by Defendants' submission, it should order an evidentiary hearing. Defendants submitted eight declarations and two purported expert reports.[7] As shown above, some of the claims in Defendants' declarations are directly contradicted by record evidence and not credible on their face. Defendants' declarations are also notable for what they omit—for instance, any discussion of why Defendants chose to set a ten-day nomination period ending on November 14 for an annual meeting that was then three months away. (*See, e.g.*, Madonna Decl. ¶¶ 23–24).

Defendants also repeatedly contend that Plaintiffs lack evidentiary support for their claims of entrenchment. (*See* Def. Br. 21 n.13, 24, 29, 31, 32 n.20, 33 n.21, 38). While Defendants' entrenchment and bad faith motives are aptly demonstrated by their public actions (detailed by Plaintiffs in their Complaint and motion papers), all other "evidence" is in Defendants' possession.

---

[7]  One of the purported experts (Lawrence Hamermesh) appears to offer opinions regarding general legal principles of corporate governance, submitting an "expert report" riddled with footnotes citing Delaware case law. Of course, determining and applying the law is the province of the Court, not the proper subject of expert testimony. *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006). Mr. Hamermesh's report should therefore be wholly disregarded.

Yet, Defendants failed to submit any Board meeting minutes, board packages, or other internal documents to support their bare declarations or counter Plaintiffs' claims. If anyone can be faulted for failing to present evidence, it is Defendants, not Plaintiffs.

Before Defendants removed the case to this Court, Plaintiffs were poised to elicit evidence and test Defendants via cross-examination under oath at the December 16 evidentiary hearing called by the state court. Rather than face that prospect, Defendants removed the case practically on the eve of the hearing. Defendants now ask this Court to simply trust their self-serving declarations. This Court should decline that invitation. At the very least, if necessary to resolve Plaintiffs' Motion, this Court should convene an evidentiary hearing at the earliest possible date so that Plaintiffs may subject Defendants' assertions to the cross-examination under oath that Defendants evaded by removing to this Court. *See Allegheny Energy*, 171 F.3d at 167 n.19.

## III.    CONCLUSION

As this Court has previously recognized, Defendants are "obligated to act in a manner that benefits shareholders." Order, Dkt. No. 15 at 6, *Hill v. Republic First Bancorp, Inc.*, No. 22-1924 (E.D. Pa. May 26, 2022) (citing *Enterra Corp. v. SGS Assocs.*, 600 F. Supp. 678, 686 (E.D. Pa. 1985)). This Court should not reward Defendants' oppressive tactics, nor should it allow Defendants to cement themselves in control of the Company by waiting out Plaintiffs and this Court until the 2022 annual meeting takes place. For the foregoing reasons and all of the reasons set forth in Plaintiffs' opening submissions, Plaintiffs respectfully request that the Court grant their Motion for Preliminary Injunction, delay the annual meeting and grant Plaintiffs the other relief requested in their proposed orders.

Dated: January 4, 2023

Respectfully submitted,

/s/ M. Norman Goldberger
**BALLARD SPAHR LLP**
M. Norman Goldberger
Adrian R. King, Jr.
Laura E. Krabill
Shawn F. Summers
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Direct: (215) 864.8622
kinga@ballardspahr.com
goldbergern@ballardspahr.com
krabilll@ballardspahr.com

*Attorneys for Plaintiffs George E. Norcross, III,*
*Gregory B. Braca, and Philip A. Norcross*

OF COUNSEL:

Brian T. Frawley
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004-2498
212.558.4000
frawleyb@sullcrom.com